UNITED STATES, Appellee

v.

James E. RANKIN, Hospital Corpsman Third Class
U.S. Navy, Appellant

No. 06-0119

Crim. App. No. 200101441

United States Court of Appeals for the Armed Forces

Argued October 18, 2006

Decided January 31, 2007

BAKER, J., delivered the opinion of the Court, in which EFFRON, C.J., and ERDMANN, J., joined.

STUCKY and RYAN, JJ., did not participate.

<u>Counsel</u>

For Appellant:  Lieutenant Brian L. Mizer, JAGC, USN (argued).

For Appellee:  Lieutenant Craig A. Poulson, JAGC, USNR (argued); Commander P. C. LeBlanc, JAGC, USN (on brief); Colonel R. F. Miller, USMC.


Military Judge:  R. W. Redcliff


**THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.**

Judge BAKER delivered the opinion of the Court.

On February 14, 2001, a special court-martial composed of officer members convicted Appellant, contrary to his pleas, of unauthorized absence, in violation of Article 86, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 886 (2000). The adjudged and approved sentence included a bad-conduct discharge and confinement for ninety-one days. The United States Navy-Marine Corps Court of Criminal Appeals affirmed. United States v. Rankin, 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006). We granted review to determine whether certain documents admitted at trial to prove the unauthorized absence were testimonial hearsay under Crawford v. Washington, 541 U.S. 36 (2004).[1] We hold that three of the four documents at issue were properly admitted under Crawford and Davis v. Washington, 126 S. Ct. 2266 (2006) as nontestimonial hearsay. The fourth document, a DD-553 military arrest warrant, arguably falls within the contours of Crawford's descriptions of testimonial evidence. Nonetheless, any possible error in admitting this document was harmless beyond a reasonable doubt. Therefore, we affirm.

---

[1] The specific issue granted was:

> WHETHER THE BUSINESS RECORDS ADMITTED INTO EVIDENCE
> OVER DEFENSE OBJECTION WERE TESTIMONIAL HEARSAY.

BACKGROUND

Appellant was tried for an unauthorized absence that began on or about July 13, 1993 and ended with his apprehension by civilian authorities on December 13, 2000. During its case-in-chief, the Government presented several documents containing a variety of service entries showing, among other things, that Appellant had been placed in the administrative status of unauthorized absence, the dates on which the absence began and ended, that his absence was terminated by apprehension by civilian authorities, and that he was on active duty at the time of the offense. In all, some nine exhibits were admitted for these purposes.

On appeal to this Court, Appellant challenges the admission of these documents as testimonial hearsay, citing Crawford, a case decided after his trial and while his case was pending before the Court of Criminal Appeals. Although the granted issue appears to reach all of the exhibits, Appellant, in his brief and at oral argument, has limited the issue to the admissibility of four specific documents, Prosecution Exhibits (PE) 5, 6, 10, and 11.[2]

PE 5 is a letter dated July 26, 1993, from the personnel officer of the 1st Marine Expeditionary Brigade (MEB) in Kaneohe

---

[2] The relevant exhibits were originally PEs 1-10. PE 9 was withdrawn. PE 4 was redacted and re-offered as PE 11.

Bay, Hawaii to Appellant's mother notifying her that her son had been an unauthorized absentee since July 13, 1993 and imploring her to urge her son to surrender to military authorities immediately.

PE 6 is a computer generated document apparently referred to in administrative parlance as a "page 6," as in page 6 of the service record book. This page 6, evidently generated by Appellant's original command, indicates that Appellant's unauthorized absence began July 13, 1993.

PE 10 is a copy of a naval message dated December 27, 2000, from the Navy Absentee Collection Information Center (NACIC), Great Lakes, Illinois to all personnel support detachments in Pearl Harbor. In addition, several organizations are listed as recipients for information purposes. They include, among others, the Navy Personnel Command, Millington, Tennessee; the Defense Finance and Accounting Service, Cleveland, Ohio; and the Fleet and Industrial Supply Center, Williamsburg, Virginia. This message informed the recipients that Appellant, who had been absent since July 13, 1993, was apprehended by civilian authorities in Honolulu, Hawaii on December 13, 2000. It further indicates that Appellant was returned to the Transit Personnel Unit in Pearl Harbor and requests that organization inform NACIC of the ultimate disposition of Appellant's

4

situation whether by nonjudicial punishment, administrative discharge, or court-martial.

PE 11 is a copy of a form DD-553 entitled "DESERTER/ABSENTEE WANTED BY THE ARMED FORCES." This form originated with the Commanding General, 1st MEB, to the Commanding Officer, Bureau of Navy Personnel, for distribution to civilian law enforcement authorities. This form contained a physical description of Appellant, and it informed the recipients that Appellant was an absentee from the armed forces as of July 13, 1993 and had remained absent for at least thirty days.

The Government offered these exhibits as records of regularly conducted activity under Military Rule of Evidence (M.R.E.) 803(6) and as public records under M.R.E. 803(8). Ms. Miki Slocum, the civilian legal clerk who had been in possession of Appellant's record book, provided the foundational testimony in support of the admissibility of all of the exhibits. The defense lodged a variety of objections including an assertion that the documents were inadmissible hearsay.[3] The military

---

[3] At trial, the defense made numerous objections to the documents based on lack of personal knowledge on the part of the foundation witness, authenticity, and the best evidence rule. However, Appellant has not advanced any of those issues or arguments on appeal in this Court, and thus our decision is limited to the Crawford question presented.

judge ruled that the requirements for the business and public records exceptions had been met and admitted the documents.

## TESTIMONIAL EVIDENCE UNDER CRAWFORD

While Appellant's case was pending review in the lower court, the United States Supreme Court decided Crawford. The lower court, aware of the precedent, applied the rationale of that case to the documents at issue here and concluded that there had been no error committed in admitting them. Rankin, 63 M.J. at 555. Crawford held that the Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." 451 U.S. at 53-54. The distinction struck in Crawford was between testimonial and nontestimonial hearsay. This Court subsequently applied the rationale of Crawford in United States v. Scheurer, 62 M.J. 100, 104-06 (C.A.A.F. 2005) and United States v. Magyari, 63 M.J. 123, 125-27 (C.A.A.F. 2006).

In Scheurer, the issue was whether statements made unwittingly to a co-worker were testimonial in nature. 62 M.J. at 104. We held that casual remarks to an acquaintance under the circumstances presented were not testimonial since the declarant had made the statements without contemplation that they would be available for use at a later trial. Id. at 105-

06.  Similarly, in Magyari, we held that certain data entries in lab reports admitted against the accused were nontestimonial. 63 M.J. at 127.  We reasoned under the circumstances presented -- a routine batch test of random urinalysis samples -- that the lab technicians "were not engaged in a law enforcement function, a search for evidence in anticipation of prosecution or trial."  Id. at 126.  As in Scheurer and Magyari, this case requires us to further define the meaning of "testimonial" in the military context and as contemplated by the Supreme Court. The question of whether the documents at issue here were inadmissible hearsay under Crawford is a question of law that we review de novo.

Although the Supreme Court did not "spell out a comprehensive definition of 'testimonial'" in Crawford, it did state that:  "Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." 451 U.S. at 68.  Further, the Supreme Court identified examples of "core" testimonial evidence, including:  1) ex parte in-court testimony such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or "similar pretrial statements that declarants would reasonably

expect to be used prosecutorially"; 2) extrajudicial statements in formalized trial materials; and 3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id. at 51-52 (citations and quotation marks omitted). The Supreme Court also noted that the "[i]nvolvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse . . . ." Id. at 56 n.7. Appellant asserts that the documents at issue here fall into the third category.

After our decision in Magyari, the Supreme Court decided Davis, further defining the concept and analytic framework for distinguishing between testimonial and nontestimonial hearsay. In Davis, an emergency 911 operator received a call from Michelle McCottry. 126 S. Ct. at 2271. During the ensuing conversation, the operator learned that McCottry was involved in a domestic disturbance with her former boyfriend, the petitioner, Adrian Davis, that Davis had just assaulted her, and that he had just fled the scene. During Davis's trial for violation of a domestic no-contact order, and over defense objection, the government played the taped conversation between McCottry and the 911 operator. After noting that 911 operators were at least agents of law enforcement and that the operator's questioning of McCottry was "interrogation in one sense," the

8

Supreme Court concluded that "the circumstances of McCottry's interrogation objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency."  Id. at 2274, 2277.  Thus, the Supreme Court concluded that her statements to the operator were not testimonial.  Id. at 2277.  In other words, the primary purpose for making the statements was something other than producing evidence with an eye toward trial or prosecution.

In the wake of Crawford and Davis, several federal courts have addressed the testimonial nature of hearsay in the context of the admissibility of warrants of deportation.  See, e.g., United States v. Bahena-Cardenas, 411 F.3d 1067, 1074 (9th Cir. 2005); United States v. Garcia, 452 F.3d 36, 41 (1st Cir. 2006); United States v. Valdez-Maltos, 443 F.3d 910, 911 (5th Cir. 2006).  In trials of aliens charged with entering the United States without permission after having been deported, the government generally offers into evidence a warrant of deportation.  Among other things, the warrant contains an attestation that a deportation officer observed the alien leave the country after he was deported.  Challenges to these documents based on Crawford have been uniformly rejected in that the warrant of deportation is not testimonial "because it was not made in anticipation of litigation" and because "it is simply a routine, objective, cataloging of an unambiguous

9

factual matter." Bahena-Cardenas, 411 F.3d at 1075. Indeed, in Magyari, we characterized the data entries by the lab technicians the same way. 63 M.J. at 126.

Consistent with Crawford and Davis, as well as federal case law more generally, a number of questions emerge as relevant in distinguishing between testimonial and nontestimonial hearsay made under circumstances that would cause an objective witness to reasonably believe that the statement would be available for use at a later trial. First, was the statement at issue elicited by or made in response to law enforcement or prosecutorial inquiry? Second, did the "statement" involve more than a routine and objective cataloging of unambiguous factual matters? Finally, was the primary purpose for making, or eliciting, the statements the production of evidence with an eye toward trial? As is evident from the Supreme Court's primary purpose analysis in Davis, in addressing the third category of potential testimonial statements, the Crawford analysis is contextual, rather than subject to mathematical application of bright line thresholds.

In applying this analysis to PEs 5, 6, and 10, we conclude that the primary purpose for creating these documents was not, as Appellant asserts, "to bring Appellant to trial." On its face, PE 5, the letter to Apellant's mother, belies any claim that this document was generated for the purpose asserted by

Appellant.  The letter simply notified Appellant's parent that

he was an unauthorized absentee from the service and sought to

emphasize the seriousness of the situation.  Regarding PE 6, the

clerk, Ms. Slocum, testified that the information contained in

the page 6 was generated from Appellant's original command's

muster report.  The exhibit itself indicates that it was

prepared about eight days after Appellant's absence began.  It

goes without saying that the commander has a significant

interest in accounting for the whereabouts of the members of his

command and knowing when a member is unaccounted for.  Again,

the claim that the primary purpose for preparing this page 6

under these circumstances was to produce incriminating evidence

for Appellant's prosecution is unsupported in the record.[4]

Similarly, PE 10, the naval message appears on its face to have

been prepared and disseminated to the addressees for the purpose

of initiating the process of Appellant's transition to military

control.  The addressees include organizations such as personnel

support detachments, the Navy Personnel Command, a supply center

and the finance service, all clearly administrative rather than

law enforcement entities.  It is true that the body of the

---

[4] We agree with Appellant that the Navy Military Personnel Manual anticipates that this type of document could be used at a court-martial.  Bureau of Naval Personnel, Naval Military Personnel Manual Article 1600-060 (Aug. 2002, updated Sept. 27, 2006). Although this could be a use to which the document might be put, our analysis concerns the primary purpose for creating the document.

message references disposition by court-martial, but it also recognizes a variety of dispositions aside from criminal prosecution. The originator of the message simply requests that it be informed regardless of what disposition is taken.

PE 11 raises some of the concerns expressed in Crawford. The DD-553 has qualities similar to an arrest warrant. See United States v. Khamsouk, 57 M.J. 282, 288 (C.A.A.F. 2002). Moreover, the form gives a civilian peace officer the authority to apprehend a military member specifically for the offense of desertion. Id. Thus, it is reasonable to conclude that the preparation of such a document has a significant prosecutorial purpose. Certainly, the primary purpose of such a document is to facilitate the arrest of a suspect and thus it is generated with an eye toward prosecution. On the other hand, the form is not necessarily generated for the purpose of producing "evidence" for trial, so much as it is intended to produce the suspect for trial.

In any event, we need not ultimately conclude whether the DD-553 in this case was "testimonial" in nature. Even if admission of the document was error, any information contained in it that was relevant to the elements of the offense was cumulative with the same type of information contained in the other exhibits that we have concluded were not testimonial

evidence.  Thus, any error in admitting the DD-553 into evidence was harmless beyond a reasonable doubt.

## THE ROBERTS ANALYSIS

Having concluded, with the possible exception of exhibit 11, that the documents are nontestimonial, we move to the final part of the analysis.  Appellant's appeal is concerned only with whether the exhibits at issue are testimonial or not, and he has not challenged the admissibility of the exhibits under Ohio v. Roberts, 448 U.S. 56 (1980).  Nonetheless, as we have held previously, when the Crawford framework does not apply, "the Ohio v. Roberts requirement for particularized guarantees of trustworthiness continues to govern confrontation analysis for nontestimonial statements."  Scheurer, 62 M.J. at 106 (footnote omitted).  Under the Roberts framework, nontestimonial hearsay is admissible if:  1) "the statement falls within a firmly rooted hearsay exception, or 2) it bears other particularized guarantees of trustworthiness."  Id. at 107 (citation and quotation marks omitted).  Here, the military judge heard the testimony of the foundation witness and admitted the exhibits under the business records exception.  See M.R.E. 803(6).  As a result, the military judge did not abuse his discretion in admitting these documents as the business records exception is firmly rooted.  Magyari, 63 M.J. at 128; see also United States v. Bridges, 55 M.J. 60, 63 (C.A.A.F. 2001).

DECISION

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed.