UNITED STATES, Appellee

v.

Ted C. SQUIRE, Sergeant First Class
U.S. Army, Appellant

No. 13-0061

Crim. App. No. 20091106

United States Court of Appeals for the Armed Forces

Argued April 3, 2013

Decided June 13, 2013

ERDMANN, J., delivered the opinion of the court, in which BAKER, C.J., STUCKY and RYAN, JJ., and COX, S.J., joined.

Counsel

For Appellant: William E. Cassara, Esq. (argued); Captain John L. Schriver (on brief).

For Appellee: Captain Edward J. Whitford (argued); Lieutenant Colonel Amber J. Roach and Major Catherine L. Brantley (on brief); Major Robert A. Rodrigues and Captain Bradley M. Endicott.

Military Judge: Donna M. Wright

**This opinion is subject to revision before final publication.**

United States v. Squire, No. 13-0061/AR

Judge ERDMANN delivered the opinion of the court.

Sergeant First Class Ted Squire was convicted at a general court-martial with members, contrary to his pleas, of engaging in a sexual act with a child who had not attained the age of twelve years, in violation of Article 120, Uniform Code of Military Justice, 10 U.S.C. § 920 (2006).[1]  He was sentenced to twenty years confinement and reduction to the grade of E-1.  The convening authority reduced the sentence of confinement to 238 months and otherwise approved the adjudged sentence.  The United States Army Court of Criminal Appeals (CCA) affirmed the findings and sentence.  United States v. Squire, No. ARMY 20091106, 2012 CCA LEXIS 306, 2012 WL 3602088 (A. Ct. Crim. App. Aug. 17, 2012).

The Confrontation Clause bars admission of the testimonial statements of a witness who did not appear at trial unless the witness was unavailable to testify and the defendant had a prior opportunity for cross-examination.  Crawford v. Washington, 541 U.S. 36, 53–54 (2004).  We granted review of this case to determine whether statements made to two medical doctors by an eight-year-old victim of a sexual assault were testimonial

---

[1] Squire was initially charged with three violations of Article 120:  Specification 1 -- engaging in a sexual act with a child who had not attained the age of twelve; Specifications 2 and 3 -- engaging in lewd acts with a child who had not attained the age of sixteen.  Specifications 2 and 3 were withdrawn by the Government prior to trial.

2

hearsay.[2]  We hold that the statements were not testimonial and that their admission into evidence was proper.  We therefore affirm the Army Court of Criminal Appeals.[3]

## Background

In the fall of 2008, Squire was engaged to Sergeant First Class (SFC) W and frequently spent the night at her home.  SFC W's adult son and her eight-year-old daughter, SL, also lived with her.  Neither child had a biological relationship to Squire.  On the morning of September 16, 2008, SFC W left her home at 6:00 a.m. to attend physical training (PT).  Squire had spent the previous night at SFC W's home and when she left for PT he was asleep on the living room couch wearing a football jersey and shorts.  SL was asleep in her upstairs bedroom.

Usually when SFC W went to morning PT she would return home between 7:45 a.m. and 8:00 a.m., but that morning she was released early and returned home at approximately 6:30 a.m. Upon her return, SFC W encountered SL coming out of the master bedroom wearing only a long t-shirt.  SL had been wearing a t-

---

[2] We granted review of the following issue:

> Whether Appellant was denied his Sixth Amendment right to confront his accuser when the military judge permitted testimonial hearsay in the form of SL's statement to a physician.

United States v. Squire, 72 M.J. 29 (C.A.A.F. 2013) (order granting review)

[3] Squire's motion to attach documents and his motion to conduct appellate discovery are hereby denied.

shirt, panties, and sleep pants when she went to bed the night before. SFC W found Squire in the bed in the master bedroom, but he was not wearing the shorts he had on when he had been sleeping on the couch. SFC W later found Squire's shorts in SL's bedroom, as well as SL's pajama pants and underwear lying on the bed. SFC W questioned SL about what had happened and SL indicated that Squire had touched her vagina. After comforting SL, SFC W sent her to school and confronted Squire, who denied any inappropriate behavior.

Later that day, SFC W took SL to Tripler Family Practice and informed them that there was a possibility that her daughter had been molested. Tripler Family Practice referred SL to the emergency room at Tripler Army Medical Center. Dr. Mary Montgomery was the emergency room physician at Tripler that day. Following her normal routine, Dr. Montgomery introduced herself and took a patient history, which included asking SL why she was there. SL told Dr. Montgomery that she had been hurt that day when "Chris"[4] put his penis in her privates. Dr. Montgomery then performed a head-to-toe physical examination of SL, including an external genital examination. The examination did not disclose any trauma to the external genitalia.

As there was "no evidence of bleeding and [SL] seemed hemodynamically stable," Dr. Montgomery determined that "at that

---

[4] SGT W and her children referred to Squire as "Chris."

4

point it would be best for a pediatric patient to have an internal genital exam done by someone who specializes in doing those types of exam[s] for children." Dr. Montgomery did not possess that particular specialty and as an emergency room physician, her primary purpose was to ensure SL was medically stable and to take a medical history and perform a physical exam, not to conduct a sex assault examination. Dr. Montgomery referred SL to Kapiolani Medical Center for an internal genital exam. Although Dr. Montgomery was aware throughout the course of her examination "that there could be potential prosecution down the road," she testified that she acted "[m]ainly to do a history and physical exam" and to "make sure the patient [was] okay."

When SFC W and SL arrived at the Kapiolani Medical Center emergency room, SL was seen by the on-call physician at the Kapiolani Child Protection Center. That night the on-call physician was Dr. Philip Hyden, who was the medical director of both the Kapiolani Child Protection Center and the Sex Abuse Treatment Center, as well as an assistant professor of pediatrics and an attending pediatrician at the Kapiolani Medical Center. Like Dr. Montgomery, Dr. Hyden began by introducing himself and by taking a patient history. During the history, SL told Dr. Hyden that Squire "put his wee wee inside me and it hurt." Dr. Hyden understood that the information he

gathered was "very likely [to be] provided to law enforcement personnel" and that he was a "mandated reporter" under Hawaii law.[5]  However, he also testified that he had been trained to begin every medical examination with a patient history and therefore it was his routine to take a medical history for any patient he saw.

After he took the history, Dr. Hyden conducted a physical exam and took evidence for a rape kit which included SL's underwear and a vaginal swab.  According to Dr. Hyden, the swabbing was done to obtain cultures for medical diagnostic purposes, but he was also aware that the cultures could be used for DNA identification purposes.  Upon completion of the physical examination, Dr. Hyden prescribed antibiotics as a precaution against sexually transmitted diseases and also arranged for SL to attend counseling.  There was no police presence or involvement in either examination, though CID agents did meet SFC W at the Kapiolani Medical Center after the examination.

SL did not testify at trial and Squire challenged the admission of SL's statements to both doctors on Confrontation Clause grounds.  The military judge held an Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2006), hearing and heard testimony from SFC

---

[5] Haw. Rev. Stat. § 350-1.1 generally requires licensed medical professionals to report suspected child abuse or neglect to the Hawaii Department of Human Services or the police.

W and both doctors.  The military judge made an initial ruling from the bench admitting the statements and later supplemented that ruling with written findings of fact and conclusions of law.  At trial, Squire was convicted on the sole charge of engaging in a sexual act with a child.

Squire subsequently appealed a number of issues to the CCA, including the Confrontation Clause issue.[6]  Squire, 2012 CCA LEXIS 306, at *2 n.1, 2012 WL 3602088, at *1 n.1.  In addressing the Confrontation Clause issue, the CCA applied the factors we set out in United States v. Rankin, 64 M.J. 348 (C.A.A.F. 2007), and United States v. Gardinier, 65 M.J. 60 (C.A.A.F. 2007), to determine whether SL's statements to the doctors were testimonial.  Squire, 2012 CCA LEXIS 306, at *5-*15, 2012 WL 3602088, at *2-*5.  The CCA concluded that SL's statements to Dr. Montgomery and Dr. Hyden were not testimonial and that their admission did not violate the Confrontation Clause.  Id.

## Discussion

Whether a statement is inadmissible testimonial hearsay under Crawford is a question of law which we review de novo.  Gardinier, 65 M.J. at 65.  The Supreme Court has not articulated a comprehensive definition of "testimonial" statements, id., but the analysis is fact specific, meaning that it is "contextual,

_____

[6] At the CCA, Squire assigned the following issues:  the Confrontation Clause issue; a challenge to the chain of custody of the rape kit; an ineffective assistance of counsel claim; and an allegation of improper release of detailed defense counsel.

rather than subject to mathematical application of bright line thresholds." Rankin, 64 M.J. at 352. While "our goal is an objective look at the totality of the circumstances surrounding the statement," Gardinier, 65 M.J. at 65, we have developed a set of factors to assist us in determining whether a given statement is testimonial. Those factors include whether: (1) the statement was elicited by or made in response to law enforcement or prosecutorial inquiry; (2) the statement involved more than a routine and objective cataloging of unambiguous factual matters; and (3) the primary purpose for making, or eliciting, the statement was the production of evidence with an eye toward trial. Id.; Rankin, 64 M.J. at 352. As we view the Confrontation Clause issue involving Dr. Hyden as a closer question than that involving Dr. Montgomery, we will first address Dr. Hyden's situation.

1. Dr. Hyden

Involvement of Law Enforcement

"[T]he '[i]nvolvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse.'" Rankin, 64 M.J. at 351 (second set of brackets in original) (quoting Crawford, 541 U.S. at 56 n.7). We have therefore determined that one relevant consideration in examining Confrontation Clause issues is whether "the statement

8

at issue [was] elicited by or made in response to law enforcement or prosecutorial inquiry." Id. at 352.

Squire argues that law enforcement was involved in Dr. Hyden's examination because: (1) Dr. Hyden was a mandatory reporter of cases involving child sexual assault victims under Hawaii state law; (2) during the examination Dr. Hyden completed a form entitled "medical-legal record and sexual assault information form" required by the State of Hawaii; and (3) he had performed over 1,000 sexual assault examinations. Squire essentially argues that, while there was no direct law enforcement involvement in this case prior to or during the examinations, Dr. Hyden's medical specialty and experience, his status as a mandatory reporter, and his completion of state mandated forms while conducting the examination, resulted in a de facto law enforcement involvement.

We disagree. The facts of this case differ sharply from the facts of Gardinier, where we found the statement testimonial in part because of police involvement. 65 M.J. at 66. There, the examination by a sexual assault nurse examiner (SANE) occurred several days after the initial medical examination and was arranged and paid for by the sheriff's office. Id. We concluded that the victim's statements were clearly the result of an inquiry initiated by law enforcement and we held that the victim's statement was testimonial. Id. Here, the connection

to law enforcement is the general requirement that Dr. Hyden, as a mandatory reporter under Hawaii law, must report and document possible sexual abuse of children after conducting a forensic examination.  We do not believe that this general requirement, which broadly covers health care professionals, employees of public and private schools, child care providers, and providers of recreational and sports activities, Haw. Rev. Stat. § 350-1.1(a)(1-7), is alone sufficient to establish that Dr. Hyden was acting in a law enforcement capacity.  Without more, we decline to "deputize [the] litany of [mandatory reporting] professionals . . . into law enforcement."  State v. Spencer, 169 P.3d 384, 389 (Mont. 2007); see also United States v. DeLeon, 678 F.3d 317, 324 (4th Cir. 2012); United States v. Peneaux, 432 F.3d 882, 895 (8th Cir. 2005); Seely v. State, 282 S.W.3d 778, 788 (Ark. 2008).[7]

Routine/Objective Cataloging

The fact that statements are a routine, objective cataloging of unambiguous factual matters is a relevant

---

[7] This is not to say that a medical professional can never act with a law enforcement purpose, but to prevail in such cases there must be a showing of something more than the fact that the doctor is an expert in the field with a statutory obligation to report suspected child abuse.  See People v. Stechly, 870 N.E. 2d 333, 366 (Ill. 2007) ("We are not holding that every mandated reporter acts as an agent of law enforcement in every interview, but merely that [the nurse's and social worker's] status as mandated reporters supports our conclusion in this case based on the fact that their actions appear to have had no other purpose than to obtain information to pass on to the authorities.").

consideration in determining whether statements are testimonial. Rankin, 64 M.J. at 352. The CCA noted that although SL's statement may have involved "more than a routine and objective cataloging of unambiguous factual matters" it would focus on the first and third factors as the second factor "'ha[d] little import in the factual scenario presently before us.'" Squire, 2012 CCA LEXIS 306, at *7 n.3  2012 WL 3602088, at *3 n.3 (alteration in original) (quoting United States v. Russell, 66 M.J. at 597, 604 n.3. (A. Ct. Crim. App. 2008)).

We did not intend for the Rankin/Gardinier factors to create a rigid set of criteria for determining whether a statement was testimonial, but rather provided them as examples of what an appellate court could consider in conducting an "objective look at the totality of the circumstances surrounding the statement[s]." Gardinier, 65 M.J. at 65. Indeed, if the phrase "unambiguous factual matters" were narrowly construed to mean uncontroverted facts, such as machine-generated data, see generally United States v. Blazier, 69 M.J. 218, 224 (C.A.A.F. 2010) ("machine-generated data and printouts . . . not 'testimonial'"), then the second factor would not be particularly helpful in cases where a statement of medical history was made to a medical provider. Regardless of how this factor is characterized, however, an inquiry into the general nature of the statement at issue can be helpful to our analysis.

Here, the record does not indicate that Dr. Hyden either prompted or led SL in his questioning. He asked her what had happened and she responded with a factual response of the incident.[8] We consider those facts relevant as a part of our broader examination of the totality of the circumstances in this case.

Primary Purpose

We have also recognized, with the third Rankin/Gardinier factor, that the statement's "primary purpose" may have a bearing on whether or not it is testimonial within the meaning of Crawford. Rankin, 64 M.J. at 352. Although the Supreme Court has generally only addressed "ongoing emergencies" as a factual predicate for finding that the "primary purpose" of the statement was not law enforcement related, it also has recognized that "there may be other circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony." Michigan v. Bryant, 131 S. Ct. 1143, 1155 (2011).[9]

---

[8] Dr. Hyden testified that SL told him that after Squire removed his pants and lay down next to her and asked her to remove her underclothes, "he put his wee wee inside me and it hurt. I told him no and pushed him away."

[9] The Supreme Court has also expressed support for the idea, in dicta, that those purposes include statements for the purpose of medical diagnosis or treatment. Bryant, 131 S. Ct. at 1157 n.9 (evidence admitted under the hearsay exception for statements for purposes of medical diagnosis or treatment does not implicate confrontation concerns); Melendez-Diaz v. Massachusetts, 557 U.S. 305, 312 n.2 (2009) ("[M]edical reports

Squire asks us to look past the medical aspects of Dr. Hyden's questions when he took SL's patient history and urges us to conclude that the primary purpose of the questioning was to gather evidence relevant to a later trial. In contrast, the Government argues that the primary purpose of the questioning was to assist in the medical treatment of SL.

When a medical provider provides treatment to the victim of a criminal offense, statements solicited by the medical provider may be primarily for medical treatment purposes, or, at the other end of the spectrum, they may be primarily for law enforcement purposes. Under many circumstances, however, the examination will have both a medical treatment and a law enforcement purpose. As the Supreme Court has noted, participants with "dual responsibilities may mean that they act with different motives simultaneously or in quick succession." Bryant, 131 S. Ct. at 1161. Here, however, the facts support the conclusion that the medical history was taken primarily for the purpose of providing medical treatment.

In evaluating the primary purpose, the law "requires a combined inquiry that accounts for both the declarant and the

---

created for treatment purposes . . . would not be testimonial under our decision today."); Giles v. California, 554 U.S. 353, 376 (2008) ("Statements to friends and neighbors about abuse and intimidation and statements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules.").

interrogator." Id. at 1160.[10] SL was referred to Dr. Hyden by

Dr. Montgomery for a specific medical reason -- neither Dr.

Montgomery nor anyone available at the Tripler Army Medical

Hospital had the medical expertise to perform a pediatric

internal genital examination. Dr. Hyden testified that he was

trained to always take a medical history at the outset of any

medical examination and his purpose in this case was to "take[]

a medical history as a pediatrician which I would do for any

patient I see before I perform a physical exam." The history

was ultimately medically significant to his conclusion that

there had been physical penetration of the vagina and that it

was necessary to administer preventative antibiotics to treat

any possible sexually transmitted diseases. Additionally,

evaluating the exchange from the perspective of the declarant,[11]

we are confident that a reasonable victim of SL's age, under

these circumstances, would not understand the purpose of her

---

[10] Nevertheless, "[t]he inquiry is still objective because it focuses on the understanding and purpose of a reasonable victim in the circumstances of the actual victim." Bryant, 131 S. Ct. at 1161-63.
[11] One formulation of "testimonial" statements is "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Crawford, 541 U.S. at 51–52 (citation and internal quotation marks omitted). In Gardinier, we noted that this formulation "offer[ed] a useful baseline to begin analysis of the testimonial quality of [statements made by a purported child victim to a SANE]," and applied the considerations set forth in Rankin to determine that the purported child victim's statements were testimonial under the circumstances. 65 M.J. at 65-66.

statements as creating "an out-of-court substitute for trial testimony."  Bryant, 131 S. Ct. at 1155.

Squire points to the fact that Dr. Hyden was aware that the results of his examination were likely to be used in a subsequent criminal prosecution, but that knowledge alone does not transform what would otherwise be a statement for the purpose of medical treatment into a testimonial statement.[12]

Conclusion:  Dr. Hyden

There was neither direct law enforcement involvement in Dr. Hyden's examination, nor was Dr. Hyden acting as a de facto law enforcement officer.  Although Dr. Hyden was aware of the possible law enforcement related consequences of his examination, under the facts established on the record in this case he acted primarily for a medical purpose while taking SL's medical history.  Therefore, under the "totality of the

---

[12] Before SFC W and SL saw Dr. Hyden at the hospital, a crisis therapist obtained SFC W's signature on a form consenting to the examination, the collection of evidence, and the release of the results of the examination to law enforcement.  While Dr. Hyden was aware of this form, he testified that his purpose for taking the patient history was to "ascertain what's wrong with the child, what the chief complaint is, what I can do about it." The consent/authorization form signed by SFC W is only indirect evidence of the purpose of the conversation between Dr. Hyden and SL, and where Appellant fails to establish that Dr. Hyden was serving either at the behest of law enforcement or as a de facto law enforcement officer, the form alone does not establish that the intent of the examination was to create an out-of-court substitute for in-court testimony rather than to facilitate the medical treatment of SL.

circumstances surrounding the statement," we conclude that SL's statements to Dr. Hyden were not "testimonial."[13]

## 2. Dr. Montgomery

Under the Rankin/Gardinier analysis, SL's statements to Dr. Montgomery were not testimonial. SFC W brought SL to Tripler Family Practice on her own volition, without having been advised by or even seeking to contact law enforcement personnel. Dr. Montgomery was an emergency room physician who did not conduct a forensic examination. In taking the patient history, Dr. Montgomery's questions to SL were narrow in scope, fact oriented, and limited to addressing SL's emergency medical condition and its causes. Finally, the primary purpose of the statements was to facilitate medical treatment for a possible sexual assault.

## Conclusion

SL's statements to both doctors were not testimonial and therefore Squire did not have a constitutional right to confront her prior to the admission of those statements. The decision of the United States Army Court of Criminal Appeals is affirmed.

---

[13] We do not hold today that any statement made to a doctor or medical professional in the context of a medical examination is per se for the primary purpose of medical treatment, or that all such statements are inherently nontestimonial. That holding would conflict with both our analysis and result in Gardinier. As we have already emphasized, the analysis of statements in Confrontation Clause cases is inherently fact specific and every case must be decided, in context, on its own facts.