# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**J.A. FISCHER, A.C. RUGH, T.H. CAMPBELL**
Appellate Military Judges

## UNITED STATES OF AMERICA

v.

## SAMUEL L. PERKINS III
## AVIATION BOATSWAIN'S MATE (FUELS) AIRMAN RECRUIT (E-1),
## U.S. NAVY

### NMCCA 201600166
Review Pursuant to Article 62(b), Uniform Code of Military Justice,
10 U.S.C. § 862(b)

**Military Judge:** CDR Heather Partridge, JAGC, USN.
**Convening Authority:** Commanding Officer, PCU GERALD R. FORD (CVN 78),
Newport News, VA.
**For Appellant:** LCDR Jeremy Brooks, JAGC, USN; LT James Belforti, JAGC, USN.
**For Appellee:** Maj Benjamin Robles, USMC.

**28 July 2016**

-----------------------------------------------------
**OPINION OF THE COURT**
-----------------------------------------------------

**THIS OPINION DOES NOT SERVE AS BINDING PRECEDENT, BUT MAY BE CITED AS
PERSUASIVE AUTHORITY UNDER NMCCA RULE OF PRACTICE AND PROCEDURE 18.2.**

CAMPBELL, Judge:

This interlocutory appeal challenges a trial ruling "which excludes evidence that is substantial proof of a fact material in the proceeding." Article 62(a)(1)(B), Uniform Code of Military Justice, 10 U.S.C. § 862. Specifically, the Government alleges that the military judge abused her discretion in excluding two audio recordings of a 911 call made by an alleged assault victim, "substantial proof . . . that Appellee possessed an unregistered firearm alleged in Specification 2 of Charge I, and that he committed the aggravated assaults alleged in Specifications 1 and 2 of Charge II. . . ."[1]

---
[1] Government Brief of 1 Jun 2016 at 1-2.

## Background

Evidence offered during pretrial motions indicates that after the appellee got home from work on 18 December 2015, as his wife cooked dinner, he became upset with her about their house aboard Naval Weapons Station Yorktown being too unkempt. During their encounter, his wife threw a pot at the appellee and ran out of the kitchen. He briefly choked her with his hands when he caught her in the hallway, and then she ran back into the kitchen. The appellee returned with his rifle that was not registered with the installation as required of on-base residents. He cocked the weapon, placed the barrel on the back of his wife's head, and guided her forward into the dining room with it. When she asked if he was going to shoot her, he replied, "Isn't that what you want?"[2]

The appellee then put the rifle on their living room couch, threw his wife's clothes on the front lawn, flushed her wedding ring down the toilet, took her military identification card, and locked her outside without pants, shoes, or her cell phone. She pounded on a door until the appellee slid her phone outside and finally let her re-enter the house. She got dressed in a bathroom, injured her wrist by hitting the mirror out of frustration, and, again unable to find her phone, left for a neighbor's house to call 911. At a pretrial session, the neighbor testified that the appellee's wife seemed "troubled" when she arrived to use the phone, and as if "she just went through an ordeal[.]"[3]

As recorded in Prosecution Exhibit 6 for Identification, a York County, Virginia, dispatcher answered the 911 call and had the following conversation with the appellee's wife:

Dispatcher:   "911, where is your emergency?"
Caller:         "1521 [street name], Yorktown, VA."

Dispatcher:   "1521 [street name]?"
Caller:         "Yes."

Dispatcher:   "OK, and you are calling from 1522?"
Caller:         "Yes."

Dispatcher:   "Alright, what's going on at 1521?"
Caller:         "Me and my husband got into a really big argument, he put his hands on me, and he put a gun to my head."

Dispatcher:   "OK, and is he at 1522?"
Caller:         "He is at 1521."

Dispatcher:   "OK. And you are at 1522?"

---

[2] Appellate Exhibit V at 19.

[3] Record at 251.

Caller:         "Yes, I came to the neighbor's house to call the police because I cannot find my phone."

Dispatcher:     "What is your husband's name?"
Caller:         "Samuel Perkins."

Dispatcher:     "And what's your name, ma'am?"
Caller:         The appellee's wife responded with her name.

Dispatcher:     "Alright.  And how did he put his hands on you?"
Caller:         "He put his hands around my neck."

Dispatcher:     "And what was this about?"
Caller:         "All over this argument because the house wasn't clean when he came home."

The county dispatcher then confirmed the caller was "on the Naval Weapons Station" Yorktown, and she requested a moment to transfer the call to the installation.  When a base dispatcher answered, the county dispatcher explained she was making a "transfer for 1521 [street name]," and gave a brief synopsis:  "Female is at 1522 [street name].  She is advising she had a domestic with her husband.  He put his hands around her throat and put a gun to her head.  Go ahead ma'am."

The remainder of the call involving the base dispatcher is captured in Prosecution Exhibit 7 for Identification:

Caller:         "Yes, I am here.  I'm at 1522.  Me and my husband got into a really big argument."
Dispatcher:     "OK."
Caller:         "And it escalated pretty bad."

Dispatcher:     "And you are at the neighbor's house now?"
Caller:         "Yes I am."

Dispatcher:     "OK, 1522, can I get your name please?"
Caller:         The appellee's wife again provided her name.

Dispatcher:     "OK, and is your husband still at home?"
Caller:         "Yes, he is as far as I know."

Dispatcher:     "Is there anyone else in the house with him?"
Caller:         "No."

Dispatcher:     "OK.  Can I get a call back number for you in case I need to get . . . now you are at your neighbor's right now?"
Caller:         "Yes I am."

Dispatcher: "OK. Can I get a good call back number for you?"
Caller: The appellee's wife then asks her neighbor for a phone number and repeats the number that he provides to the base dispatcher.

Dispatcher: "OK. Now again, uh, York County said that he had placed his hands around your throat?"
Caller: "Yes."

Dispatcher: "And did you say that he had a weapon?"
Caller: "Yes."

Dispatcher: "OK. Has he been drinking?"
Caller: "No."

Dispatcher: "OK."
Caller: "Not that I know of."

Dispatcher: "Alright. And he is at home by himself?"
Caller: "Yes."

Dispatcher: "OK. Alright, are you hurt in any way?"
Caller: "Uhm, I think my wrist may be sprained or broken. I don't know. It is really hard to tell."

Dispatcher: "OK. I can send a rescue unit there also along with the police folks to get you looked at."
Caller: "OK."

Dispatcher: "Alright, and your name, you said, was [the appellee's wife's name]?"
Caller: "Yes."

Dispatcher: "All right. All right. We will get folks out there immediately. I'll have the security folks show up first, but I'll also have a rescue unit come out. They'll stand by until the security folks make the area safe for them. But then they'll come see you and take a look at your wrist."
Caller: "OK."

Dispatcher: "Alright? Alright. We'll get some folks out there very soon."
Caller: "Alright. Thank you."

Dispatcher: "OK."
Caller: "Alright, bye, bye."

Three base policemen initially responded in two vehicles to the base dispatcher's radio call. They intentionally did not use emergency lights or sirens within the neighborhood because, as one of them testified, "I didn't want to approach the house with lights and sirens if a weapon was involved to let [the appellee] know that I was out there right away."[4] They "parked down the street" from the appellee's house.[5] After brief contact with the appellee's wife at the neighbor's house, they set a security perimeter and observed the appellee moving in a "nonchalant" manner within his home.[6] The appellee did not respond to their knocks on the doors and windows, or the separate officials' repeated calls over vehicle loud speakers for him to "come out of the house"[7] and "come out of the house with your hands up"[8] during the first three hours that the police were there. The appellee was finally apprehended without incident after he walked outside, unarmed.

Following the apprehension, Naval Criminal Investigative Service (NCIS) personnel assumed jurisdiction and commenced an investigation. The NCIS case agent began next door by interviewing the neighbor instead of starting with the appellee's wife because, during the police standoff, she received on-site medical care and was taken to a local hospital. While the case agent interviewed the neighbor, the appellee's wife returned there from the hospital. She also provided an oral statement and authorized a search of her home, resulting in the seizure of an unloaded .22 caliber rifle found on the living room couch. But she declined to make a written statement to NCIS or otherwise participate further in the case.

A special court-martial comprised of officer and enlisted members assembled to try the appellee for disobeying lawful orders and for assaulting his wife with both a dangerous weapon and a force likely to produce death or grievous bodily harm, alleged violations of Articles 92 and 128, UCMJ, 10 U.S.C. §§ 892 and 928.

The next day, outside the members' presence, the parties litigated the Government's motion to pre-admit the two 911 audio recordings. Expecting to commence with opening statements to the members the following day, the military judge issued her ruling that afternoon. She concluded that the recordings met a hearsay exception, but were testimonial in nature. Since the appellee's wife had never testified and was not expected to do so at trial, the military judge determined that admitting the recordings into evidence would violate the Confrontation Clause. The Government requested a delay under RULE FOR COURTS-MARTIAL 908, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.), and then appealed the ruling.

---

[4] *Id.* at 244. According to the same testimony, another base police officer later arrived at the appellee's house in a vehicle with the emergency lights and sirens engaged. *Id.* The testifying officer had been on scene for approximately an "[h]our and a half" when that vehicle arrived. *Id.* at 247.

[5] *Id.* at 231, 237.

[6] *Id.* at 241.

[7] *Id.* at 246.

[8] *Id.*

## Discussion

We review a military judge's decision to admit or exclude evidence for an abuse of discretion. *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008). We review findings of fact under the clearly-erroneous standard and conclusions of law *de novo*. *United States v. Ayala*, 43 M.J. 296, 298 (C.A.A.F. 1995). "A military judge abuses h[er] discretion when: (1) the findings of fact upon which [s]he predicates h[er] ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if h[er] application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citation omitted). An abuse of discretion also occurs when "the military judge's decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law." *United States v. Miller*, 66 M.J. 306, 307 (C.A.A.F. 2008). "If the military judge fails to place h[er] findings and analysis" of pertinent facts "on the record, less deference will be accorded" to the military judge, even under the abuse of discretion standard. *United States v. Flesher*, 73 M.J. 303, 312 (C.A.A.F. 2014).

The military judge emailed the parties her one-page evidentiary ruling at issue here:

The Defense objection to the preadmission of PE 6 for ID and PE 7 for ID on the basis of hearsay is overruled per M.R.E. 803(1) (present sense impression).

However, per the analysis in Davis v. Washington and Hammon v. Indiana, 547 U.S. 813 (2006), PE 6 for ID and PE 7 for ID are testimonial and may not be admitted in violation of the Confrontation Clause absent a determination of forfeiture by wrongdoing on the part of the accused. Otherwise admissible hearsay remains subject to scrutiny to determine whether there [are] sufficient indicia of reliability to avoid offending the Sixth Amendment. Therefore, the defense must have some opportunity for cross-examination of [the alleged victim].

Factors I considered included those enumerated in [*United States v. Rankin*, 64 M.J. 348 (C.A.A.F. 2007)]: the statements made were in response to law enforcement inquiry, the statements involved more than a routine and objective cataloging of unambiguous factual matters, and the primary purpose was for making or eliciting evidence with an eye toward trial. These factors are more clear regarding PE 7 for ID in the statements repeated to or elicited from [the on-base dispatcher]. Most notably, the primary purpose of the communication was not to meet an ongoing emergency. After the offenses alleged in Charge II, [the alleged victim] was outside of the residence, obtained her cell phone from the accused, went back into the residence for some belongings, injured herself by striking a wall in the bathroom, dressed, and went to the neighbor's residence to call 911. The statements [the alleged victim] made to 911 were therefore not communicating an ongoing emergency or to resolve an immediate threat to her person; rather, the primary purpose was to establish or prove past events.[9]

---

[9] AE XXII.

6

The Government contends that the military judge denied admission of the 911 recordings based on two erroneous views of the law—"she used the overturned 'sufficient indicia of reliability' test from *Ohio v. Roberts* to determine the recordings were testimonial, and she misapplied the test of *Ohio v. Clark* in analyzing the 'primary purpose' test."[10] We partially agree, and hold that, based upon the stated grounds for the ruling, the military judge abused her discretion in denying admission of the evidence.

### *Misapplication of Indicia of Reliability*

While including key language from an overturned legal principle, the trial ruling does not completely state the prior test. In *Ohio v. Roberts,* 448 U.S. 56 (1980), the Supreme Court held that a criminal defendant's Sixth Amendment right to be confronted with the witnesses against him "permit[ted] the admission of out-of-court statements by an unavailable witness, so long as the statements bore 'adequate indicia of reliability'" as "'evidence fall[ing] within a firmly rooted hearsay exception' or bear[ing] 'particularized guarantees of trustworthiness.'" *Ohio v. Clark*, 135 S.Ct. 2173, 2179 (2015) (quoting *Roberts*, 448 U.S. at 66).

The landmark decision in *Crawford v. Washington*, 541 U.S. 36 (2004), overturned the indicia of reliability test by holding that what the Sixth Amendment "prohibits [is] the introduction of testimonial statements by a nontestifying witness, unless the witness is 'unavailable to testify, and the defendant had had a prior opportunity for cross-examination.'" *Id.* at 2179 (quoting *Crawford*, 541 U.S. at 54). Under *Crawford*, even evidence that undoubtedly qualifies as a hearsay exception may be testimonial if the declarant acts as a witness in making the pretrial statement. Therefore, such evidence is inadmissible despite having indicia of reliability unless the declarant is subject to defense confrontation. Conversely, non-testimonial statements are exempt from "Confrontation Clause scrutiny altogether," and they may be admitted if they are within a firmly rooted hearsay exception or bear other particularized guarantees of trustworthiness. *Crawford*, 541 U.S. at 68. *See also United States v. Scheurer*, 62 M.J. 100, 106 (C.A.A.F. 2005) (noting the "requirement for particularized guarantees of trustworthiness continues to govern confrontation analysis for nontestimonial statements").

In assessing whether statements made to police outside of the custodial interrogation context were properly admitted during two separate trials, the Supreme Court further refined the meaning of testimonial statements for purposes of the Confrontation Clause analysis in *Davis v. Washington*, 547 U.S. 813 (2006). The Court again explained, "[i]t is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause," *Id.* at 821, and it then held:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such

---

[10] Government Brief at 11.

ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 822.

Unlike Justice Scalia, author of the *Crawford* and *Davis* majority opinions, the majority in *Michigan v. Bryant*, 562 U.S. 344 (2011), found that "[i]mplicit in *Davis* is the idea that because the prospect of fabrication in statements given for the primary purpose of resolving [an] emergency is presumably significantly diminished, the Confrontation Clause does not require such statements to be subject to the crucible of cross-examination." *Bryant*, 562 U.S. at 361. Justice Scalia argued in dissent that *Bryant* created "a revisionist narrative" of *Crawford* and *Davis*:

> The Court attempts to fit its resurrected interest in reliability into the *Crawford* framework . . . [based on reliability being] a good indicator of whether a statement is . . . an out-of court substitute for trial testimony. That is patently false. Reliability tells us *nothing* about whether a statement is testimonial.

*Id.* at 392 (Scalia, J., dissenting) (citation  and internal quotation marks omitted). This aspect of his critique also responded to the *Bryant* Court's suggestion that, building on *Davis*, "there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony" and that "[i]n making the primary purpose determination, standard rules of hearsay, designed to identify some statements as reliable, will be relevant." *Id.* at 358-59.

Thus, the premise that "[o]therwise admissible hearsay remains subject to scrutiny to determine whether there [are] sufficient indicia of reliability to avoid offending the Sixth Amendment" misstates the law.[11] Using these incorrect legal principles, the trial ruling here would consider sufficient indicia of reliability to be the *sine qua non* for whether admission of the 911 recordings violates the Confrontation Clause. Even Justice Scalia's protests stopped short of suggesting that such an outright reinstatement of the prior law exists under the Supreme Court's most recent *Crawford* progeny. *See Bryant*, 562 U.S. at 392-93; *see also Clark*, 135 S.Ct. at 2185 ("A suspicious mind (or even one that is merely not naïve) might regard this distortion as the first step in an attempt to smuggle longstanding hearsay exceptions back into the Confrontation Clause—in other words, an attempt to return to *Ohio* v. *Roberts*.) (Scalia, J., concurring in the judgment).

Despite the Government's contention, this portion of the ruling does not actually state the *Ohio v. Roberts* test—under which sufficient indicia of reliability made otherwise *inadmissible* hearsay admissible under both the hearsay exception rules and the Confrontation Clause. We also note that after stating the incorrect premise, the ruling seems to abandon it in favor of a *Rankin* factors analysis. Consequently, we must review that analysis for an abuse of discretion.

---

[11] AE XXII.

8

*Misapplication of the Primary Purpose Test*

In determining that, "[m]ost notably, the primary purpose of the" appellee's wife's responses to the 911 dispatchers' questions "was not to meet an ongoing emergency,"[12] the military judge abused her discretion both by concluding that there was no ongoing emergency without conducting the complete, requisite analysis and by misstating the primary purpose test altogether.

*Ongoing Emergency Analysis*

As the Supreme Court explained in *Bryant*, "the existence and duration of an emergency depend on the type and scope of danger posed to the victim, *the police, and the public.*" 562 U.S. at 370-71 (emphasis added). The military judge's ongoing emergency analysis focused solely on whether the appellee's wife was in imminent danger. It noted that when the 911 call occurred, the appellee's wife was outside her home, she had retrieved her cell phone from the appellee, she had re-entered the home after the alleged assaults, and she called 911 from a neighbor's house.[13] The military judge concluded that the 911 call recordings do not capture the appellee's wife "communicating an ongoing emergency or . . . resolv[ing] an immediate threat to her person."[14]

The ruling does not address the responding officials' actions and whether the situation posed a danger to them or the public. Yet their actions suggest, as the base dispatcher articulated, that their most immediate task in light of the 911 call was to "make the area safe for them."[15] The police approached without emergency lights or sirens, set a security perimeter before the medical support arrived, attempted to get the appellee to come outside (conceivably to determine whether he remained armed, to observe his demeanor, *etc.*), and essentially engaged in a three-hour standoff until the appellee finally emerged.

Therefore, with no findings of fact or conclusions of law as to the dangers posed to the police and the surrounding community, we conclude that the military judge abused her discretion in deciding that there was no ongoing emergency. Under our *de novo* analysis, based upon the nature of the reported assaults, the purported victim's circumstances during the 911 call, and the responding officials' circumstances, we conclude an ongoing emergency still existed during the 911 recordings.

*Primary Purpose Analysis*

But "the existence *vel non* of an ongoing emergency is not the touchstone of the testimonial inquiry[.]" *Bryant*, 562 U.S. at 374. "[W]hether an ongoing emergency exists is simply one factor . . . that informs the ultimate inquiry regarding the 'primary purpose' of an

---

[12] AE XXII.

[13] *Id.*

[14] *Id.*

[15] Prosecution Exhibit 7 for Identification.

interrogation." *Id.* at 366. Reflecting the evolution in this area of the law, our higher court has recognized that under the third *Rankin* factor "'there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony.'" *United States v. Squire*, 72 M.J. 285, 289 (C.A.A.F. 2013) (quoting *Bryant*, 562 U.S. at 358 (emphasis in original)).

The correct test for that ultimate inquiry is "whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony," *Clark*, 135 S.Ct. at 2180 (alteration in original) (quoting *Bryant*, 562 U.S. at 358). In conducting this analysis, "the informality of the situation and the interrogation" is an "additional factor" to consider.[16] *Id.* (quoting *Bryant*, 562 U.S. at 377). "[L]ess formal questioning is less likely to reflect a primary purpose aimed at obtaining testimonial evidence against the accused." *Id.*

"In addition to the circumstances in which an encounter occurs, the statements and actions of both the declarant *and interrogators* provide objective evidence of the primary purpose of the interrogation." *Bryant*, 562 U.S. at 367 (emphasis added) (citation omitted). For instance, "if the police say to a victim, 'Tell us who did this to you so that we can arrest and prosecute" the perpetrator, then "by virtue of the phrasing of the question, the victim necessarily has prosecution in mind[.]" *Id.* At 368. Thus, the third *Rankin* factor also "'requires a combined inquiry that accounts for both the declarant and the interrogator.'" *Squire*, 72 M.J. at 290 (quoting *Bryant*, 562 U.S. at 367).

Despite the initial language about determining whether "otherwise admissible hearsay" has "sufficient indicia of reliability to avoid offending the Sixth Amendment," the military judge ultimately concluded with a more accurate focus on the primary purpose test—looking to whether "the primary purpose" of the appellee's wife's responses to the 911 dispatchers' questions "was to establish or prove past events."[17] But even if we excise the earlier misstatement of Confrontation Clause legal principles, what the military judge considered in ultimately applying the primary purpose test was, like her ongoing emergency analysis, too limited. The ruling neither addressed the statements and actions of the base dispatcher, nor considered the informal setting for the appellee's wife's statements. Consequently, under *Ellis*, the military judge abused her discretion.

Considering all the circumstances, we conclude they objectively indicate that the primary purpose of the appellee's wife's statements within the 911 recordings was not to create a substitute for trial testimony. Therefore, as non-testimonial hearsay for which the military judge has already determined an evidentiary hearsay exception applies, the 911 recordings are admissible on these grounds.

---

[16] Whether the statements were made to law enforcement officers or to persons other than law enforcement officers may also be a factor for consideration. *Clark*, 135 S.Ct. at 2181. However, despite the Government's arguments to the contrary, 911 calls fall within the law enforcement context. *See Davis*; *Clark*.

[17] AE XXII.

**CONCLUSION**

The appeal is granted. The ruling excluding the 911 recordings is hereby vacated. The record of trial is returned to the Judge Advocate General for return to the military judge for further actions consistent with this opinion.

Senior Judge FISCHER and Judge RUGH concur.

For the Court



R.H. TROIDL
Clerk of Court

11