# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

_____

## No. 201500204

_____

## UNITED STATES OF AMERICA
Appellee

v.

## WASSEF A. HASSOUN
Corporal (E-4), U.S. Marine Corps
Appellant

_____

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Major N.A. Martz, USMC.
For Appellant: Major M. Brian Magee, USMC.
For Appellee: Lieutenant Commander Justin Henderson, JAGC, USN; Captain Matthew M. Harris, USMC.

_____

Decided 11 August 2016

_____

Before FISCHER, RUGH, and MARKS, *Appellate Military Judges*

_____

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

_____

RUGH, Judge:

At a general court-martial, a military judge convicted the appellant, contrary to his pleas, of one specification of desertion with the intent to remain away permanently, one specification of desertion with the intent to avoid hazardous duty, and one specification of negligent loss of military property in violation of Articles 85 and 108, Uniform Code of Military Justice, 10 U.S.C. §§ 885 and 908. The convening authority approved the adjudged sentence of 735 days' confinement, forfeiture of all pay and allowances, reduction to pay grade E-1, and a dishonorable discharge.

In his sole assignment of error (AOE), the appellant asserts that his conviction for the offense of desertion with the intent to remain away permanently was legally and factually insufficient. We disagree.

## I. BACKGROUND

In March 2004, the appellant was a member of Human Intelligence Exploitation Team (HET) 9 beginning his second deployment to Iraq as a translator in support of 2d Battalion, 2d Marine Regiment. During that period, HET 9 was tasked with preparing the battlefield in advance of the Battle for Fallujah. As a result, they were under near constant attack.

The appellant was born in Lebanon but immigrated to the United States to attend college. After September 11th he joined the Marine Corps to prove his loyalty to his new country and to demonstrate that "just because I am Arab does not mean that I'm in any way [in] support of what happened."[1] However, by May 2004 several events converged to change the appellant's view of his service and his situation.

First, an HET 9 gunnery sergeant and mentor to the appellant was killed when a mortar round struck him during combat operations outside Fallujah, Iraq. The appellant also faced disciplinary action for a negligent discharge incident which resulted in his temporary reassignment to camp guard duty. During the same period, the appellant's family members discovered that he was deployed to Iraq, a secret he had long maintained, when he appeared in television coverage of the first Battle for Fallujah. Finally, members of HET 9 learned that their deployment would be extended by seven months. The extension meant that the appellant would not be home in time to attend his own wedding scheduled for the fall in Lebanon.

After these negative events, the appellant began expressing a strong desire to leave his unit and the Marine Corps. Regarding the deployment extension, he told members of his unit, "I don't care. It doesn't matter to me. I will leave if I want to."[2] He also stated, "I can't handle this. I will leave. I will walk out the base," and he shared with another translator that he didn't care if his actions resulted in disciplinary charges.[3] Upon learning that HET 9 would leave Camp Fallujah on 20 June 2004 and return to Mahmudiyah,

---

[1] Record at 1170.

[2] *Id.* at 456.

[3] *Id.* at 474, 596.

Iraq, he fretted that he was returning to his "death place," communicating to a local national, that he "didn't want to die with them [the Marines]."[4]

On 18 June 2004, the appellant retrieved his personal backpack from storage and attempted to borrow $200.00 from a teammate. The next day he took an advance of $350.00 from disbursing. In the days leading up to this, the appellant was seen burning personal effects including private letters. He asked a local national: "If I left the base or the Marine Corps, can you hide me in [your] house?"[5]  His Marine Federal Credit Union account was drained of funds, and the appellant made an anxious phone call on a shared cell phone, subsequently deleting the number from the call log.[6]

Then, on 20 June 2004, the appellant vanished from Camp Fallujah, Iraq. Civilian clothes, grooming gear, his passport, the cash, his tactical vest, and his 9mm Beretta service weapon were missing from the belongings he left behind.

Within weeks of the appellant walking away from Camp Fallujah, he reappeared in the custody of his relatives near Tripoli, Lebanon.[7]  By 6 July 2004, members of the appellant's family contacted the U.S. Embassy in Lebanon, and the defense attaché negotiated the appellant's return to American custody.[8]

---

[4] *Id*. at 392, 433.  Even before these events, the appellant expressed a cavalier attitude about remaining with his unit, telling another Marine during his first deployment in 2003 that he might leave Iraq for Lebanon to marry his wife, after which he "just [wouldn't] go back to the Marine Corps." *Id*. at 308.

[5] *Id*. at 431, 432.

[6] The government argued that this phone call was for the purpose of arranging transportation to Lebanon with a relative once he left the base.

[7] At trial the appellant asserted that he was abducted by an Iraqi insurgent group and held until his release was negotiated by his family.  Regardless of whether the appellant was ever legitimately held in captivity in Iraq, the overwhelming weight of the evidence points to an intention to avoid hazardous duty by planning for and then leaving Camp Fallujah voluntarily on or about 20 June 2004. The appellant does not raise as error the findings of the military judge as to this charge.

[8] The appellant's return was not all smooth sailing as the defense attaché testified at trial.  The appellant was detained by Syrian police as U.S. officials attempted to put him on a U.S. Air Force plane leaving Beirut.  Only the quick-witted efforts of the defense attaché, who helped generate travel documents for the appellant using photographs off the internet, convinced Syrian officials to let the appellant leave as planned. *See id*. at 863, 864.

On 9 December 2004, charges of desertion, willful loss of military property, and larceny of military property were preferred against the appellant. A preliminary hearing pursuant to Article 32, UCMJ, was scheduled, and the appellant was permitted leave to visit his family in Utah pending the hearing. Instead of returning at the expiration of his leave on 5 January 2005, the appellant traveled to Canada where he caught a flight bound for Lebanon. His wife followed him several days later.[9] They established a life together in Lebanon, raising two children, and the appellant held several jobs including as a translator, a security guard for a Lebanese member of parliament, and an assistant in his brother's store.

In late 2013 the appellant and the U.S. Government began negotiations for his return to military custody in connection with the appellant's application for U.S. immigration status for his wife and children. At his court-martial, the appellant asserted that he was prevented from returning to U.S. custody during this near nine-year period because Lebanese officials confiscated his passport and told him to remain in the country while they investigated the United States' request for extradition.[10] However, from January 2005 until September 2013, the appellant never contacted any member of his unit, the Marine Corps, the U.S. Embassy, or any other U.S. Government representative. On 28 June 2014, the appellant voluntarily surrendered to a Naval Criminal Investigative Service special agent in Bahrain and was finally returned to military custody.

## II. DISCUSSION

We review questions of legal and factual sufficiency *de novo*. Art. 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, any reasonable fact-finder could have found all the essential elements beyond a reasonable doubt." *United States v. Day*, 66 M.J. 172, 173-74 (C.A.A.F. 2008) (citing *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987)). In applying this test, "we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

---

[9] During trial, the appellant asserted that he and his wife returned to Lebanon in January 2005 to seek a divorce. However, they began living together within a month or two of her return, and they remained married up through the time of his court-martial.

[10] In support of this theory, the appellant pleaded guilty to an unauthorized absence of less than 30 days beginning on 5 January 2005. The military judge found him provident for an absence of less than 3 days before finding him guilty to the greater offense of desertion with the intent to remain away permanently.

The test for factual sufficiency is whether "after weighing all the evidence in the record of trial and recognizing that we did not see or hear the witnesses as did the trial court, this court is convinced of the appellant's guilt beyond a reasonable doubt." *United States v. Rankin*, 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006) (citing *Turner*, 25 M.J. at 325 and Art. 66(c), UCMJ), *aff'd*, 64 M.J. 348 (C.A.A.F. 2007). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

The appellant challenges the legal and factual sufficiency of his conviction for desertion with the intent to remain away permanently, asserting that the evidence fails to demonstrate the required intent.

To be guilty of this form of desertion, the appellant must have intended to remain away permanently from his unit, organization, or place of duty. MANUAL FOR COURTS-MARTIAL (MCM), UNITED STATES (2012 ed.), Part IV, ¶ 9.c.(1)(c)(ii). This intent may have been "formed at any time during the unauthorized absence," and did not need to "exist throughout the absence or for any particular period of time." It is sufficient that the appellant formed this intent at some time during the absence. *Id.* at ¶ 9.c.(1)(c)(i) and (ii).

The intent to remain away permanently may be proved by circumstantial evidence. *United States v. Oliver*, 70 M.J. 64, 66 (C.A.A.F. 2011); MCM, Part IV, ¶ 9.c.(1)(c)(iii). The MCM provides several illustrations of potentially relevant, circumstantial evidence:

[T]hat the period of absence was lengthy; that the accused attempted to, or did dispose of uniforms or other military property; that the accused purchased a ticket for a distant point or was arrested, apprehended, or surrendered a considerable distance from the accused's station; that the accused could have conveniently surrendered to military control but did not; that the accused was dissatisfied with the accused's unit, ship, or with military service; that the accused made remarks indicating an intention to desert; that the accused was under charges or had escaped from confinement at the time of the absence; [or] that the accused made preparations indicative of an intent not to return (for example, financial arrangements)[.]

MCM, Part IV, ¶ 9.c.(1)(c)(iii). In this regard, the appellant perpetrated a veritable "Bingo" card of statements and actions which confirmed the aims of his nine-year absence. Before his first absence in Iraq, the appellant expressed dissatisfaction with the Marine Corps on numerous occasions,

5

voicing a willingness to leave without concern for the legal consequences. Once he returned to military control in July 2004, the appellant was charged with desertion, larceny, and the willful loss of his service weapon. He was pending a preliminary hearing on these charges when he was allowed holiday period leave. While on leave in Utah, the appellant surreptitiously crossed the border into Canada and flew to Tripoli, Lebanon. In doing so, he drained his Marine Federal Credit Union bank account of all its funds[11] and abandoned his luggage, allowing his uniforms to be sent on without him to Camp Lejeune, North Carolina. Within ten days of arriving in Lebanon, his wife left the United States to reunite with him there. The appellant and his wife raised a family, and he held several jobs. Unlike the earlier events in 2004 when the appellant and his family negotiated his prompt return, the appellant made no efforts during the period of his second absence to contact the U.S. embassy or the area defense attaché—despite learning from past experience, that the U.S. embassy could assist him in procuring a new passport and returning to military custody. In the end, the appellant sought to turn himself in only as part of a larger effort to move his wife and children from Lebanon to the United States beginning in 2013.

After carefully reviewing the record of trial and considering the evidence in the light most favorable to the prosecution, we are convinced that a reasonable fact finder could have found that the appellant formed the intent to remain away permanently at some time during his absence from January 2005 to June 2014. Furthermore, after weighing all the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced beyond reasonable doubt of the appellant's guilt.

### III. CONCLUSION

The findings and sentence as approved by the convening authority are affirmed.

Senior Judge FISCHER and Judge MARKS concur.

For the Court



R.H. TROIDL
Clerk of Court

---

[11] This account was closed within the year, its negative balance written off.