# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

————————————

**No. 201600060**

————————————

## UNITED STATES OF AMERICA
Appellee

v.

## NATHANIEL BRACEWELL
Boatswain's Mate Second Class (E-5), U.S. Navy
Appellant

————————————

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Captain Robert J. Crow, JAGC, USN.
Convening Authority: Commander, Navy Region Southeast, Naval
Air Station, Jacksonville, FL.
Staff Judge Advocate's Recommendation: Commander Nell O. Evans,
JAGC, USN.
For Appellant: Lieutenant Rachel Weidemann, JAGC, USN.
For Appellee: Major Corey Carver, USMC; Captain Sean Monks,
USMC.

————————————

Decided 11 May 2017

————————————

Before GLASER-ALLEN, MARKS, and JONES, *Appellate Military Judges*

————————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

————————————

GLASER-ALLEN, Chief Judge:

At a contested general court-martial, officer and enlisted members convicted the appellant of three specifications of abusive sexual contact against Engineman Third Class (EN3) AC—violations of Article 120(d),

Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920 (2012).[1] The members sentenced the appellant to six months' confinement, reduction to paygrade E-1, and a dishonorable discharge. The convening authority (CA) approved the sentence and, except for the punitive discharge, ordered it executed.

The appellant raises two assignments of error: (1) the evidence is legally and factually insufficient for his convictions; and (2) his sentence is inappropriately severe. We find no error materially prejudicial to the appellant's substantial rights and affirm. Arts. 59(a) and 66(c), UCMJ.

## I. BACKGROUND

The appellant was stationed aboard USS FORT MCHENRY (LSD 43). On 3 June 2014, the ship made a port visit to Mayport, Florida. The appellant and fellow male shipmates socialized at a bar and strip club that evening. At both locations his group independently encountered a group of female Sailors from the ship, including Hospital Corpsman First Class (HM1) AA and EN3 AC.

Both groups left the club in separate vehicles and returned to base around 0200. They parked near the ship. HM1 AA's shipmates were unable to rouse her upon return. Therefore, they decided EN3 AC would remain in the parked sport-utility vehicle (SUV) with HM1 AA until she could regain her faculties enough to return to the ship.

The appellant expressed his concerns that it was unsafe for EN3 AC and HM1 AA to remain in the SUV, but EN3 AC elected to remain in the vehicle with HM1 AA while both groups returned to the ship. EN3 AC watched the appellant and both groups head toward the ship, locked the doors to the SUV, and went to sleep in the second row of seats. A few minutes later, she awoke to the appellant attempting to enter the vehicle. She persuaded him that she and HM1 AA were safe in the parking lot and went back to sleep.

EN3 AC believed she had locked the SUV, but when she next awoke, the appellant was inside the vehicle staring at her. He climbed into the second row of seats with her, put his tongue in her mouth, pushed her cheeks together to put his tongue in her mouth again, then touched and put his mouth on her breast under her bra. She eventually escaped the SUV, ending the assault. Her efforts to get HM1 AA out of the vehicle resulted in HM1 AA falling to the ground. While this fall roused her, HM1 AA was still unable to walk unassisted. The appellant insisted on helping to carry HM1 AA, so he

---

[1] The members acquitted the appellant of one specification of abusive sexual contact against Hospital Corpsman First Class AA.

and EN3 AC assisted HM1 AA onto the ship. Within the next day or two, EN3 AC told a friend about the incident, and the friend reported it.

## II. DISCUSSION

### A. Legal and factual sufficiency

We review questions of legal and factual sufficiency *de novo.* Art. 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, any reasonable fact-finder could have found all the essential elements beyond a reasonable doubt." *United States v. Day*, 66 M.J. 172, 173-74 (C.A.A.F. 2008) (citing *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987)). In applying this test, "we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

The test for factual sufficiency is whether, "after weighing all the evidence in the record of trial and recognizing that we did not see or hear the witnesses as did the trial court, this court is convinced of the appellant's guilt beyond a reasonable doubt." *United States v. Rankin*, 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006) (citing *Turner*, 25 M.J. at 325 and Art. 66(c), UCMJ), *aff'd on other grounds*, 64 M.J. 348 (C.A.A.F. 2007). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399. We may "judge the credibility of witnesses, and determine controverted questions of fact," and substitute our judgment for that of the fact finder. Art 66(c), UCMJ; *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990). While this is a high standard, the phrase "beyond a reasonable doubt" does not imply that the evidence must be free from conflict. *Rankin*, 63 M.J. at 557 (citation omitted).

Under 10 U.S.C. § 920(d) (2012), a person subject to the UCMJ "who commits or causes sexual contact upon or by another person, if to do so would violate subsection (b) (sexual assault) had the sexual contact been a sexual act, is guilty of abusive sexual contact[.]" A "sexual contact" is "any touching . . . either directly or through the clothing, any body part of any person, if done with an intent to arouse or gratify the sexual desire of any person. Touching may be accomplished by any part of the body." 10 U.S.C. § 920(g)(2)(B). A "bodily harm" is "any offensive touching of another, however slight, including any nonconsensual sexual act or nonconsensual sexual contact." 10 U.S.C. § 920(g)(3).

Thus, to convict the appellant of abusive sexual contact, the government had to prove:

> One, that on or about 3 June 2014, at or near Mayport, Florida, the appellant committed sexual contact upon EN3 AC, to wit:
>
> wrongfully kiss[ing] her lips (Specification 1);
>
> wrongfully touching her breast with his hand (Specification 2) and his tongue (Specification 3);
>
> and;
>
> Two, that he did so by causing bodily harm to EN3 AC to wit:
>
> squeezing her cheeks with his hand (Specification 1);
>
> nonconsensual sexual contact (Specifications 2 and 3).

Record at 438-49; MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.), Part IV, ¶45.b.(8)(b); Appellate Exhibit XXI.

The appellant argues "[t]he Government did not prove the sexual contact [specifications] were committed by bodily harm."[2] The appellant concedes that his own statements in the recorded Naval Criminal Investigative Service (NCIS) interrogation, his sworn statement, and the DNA evidence establish that "some sexual contact did occur."[3] However, he avers there is insufficient evidence to establish the sexual contact "was nonconsensual or was committed by bodily harm"[4] because the government's "only evidence was the testimony of an unbelievable witness who lacked any corroboration."[5] We disagree.

Despite some inconsistencies, overall we find EN3 AC's account of the sexual contact credible, as she described all three charged offenses in detail and it was clear that she had demonstrated no sexual interest in the appellant.

EN3 AC testified that she and the appellant never dated, never had a sexual encounter, and had only a professional relationship. She further

---

[2] Appellant's Brief of 16 Aug 2016 at 13.

[3] *Id*. The government expert testified that his DNA profile was about "ten times higher than EN3 AC's DNA profile," and concluded that this difference would result from either prolonged contact of the inside of the bra by the appellant or from his bodily fluid being present. Record at 247.

[4] We note that "[t]he definition of bodily harm . . . includes nonconsensual sexual acts or contact." *United States v. Guin*, 75 M.J. 588, 593 (N-M. Ct. Crim. App. 2016), *rev.denied*, 75 M.J. 367 (C.A.A.F. 2016).

[5] Appellant's Brief at 11.

explained that she had rebuffed his advances that evening, did not dance with him at all that night, and gave him no impression that she was interested in him. When he told her he did not think it was safe to remain in the SUV, she ignored him. And the first time he approached the SUV in the parking lot after both groups headed toward the ship, she told him to go away. This is all consistent with EN3 AC's contention that none of the sexual contact was consensual—but was instead bodily harm.

First, she explained that at the strip club, the appellant sent a friend to ask her to come over to his table. When she went to the table, the appellant told her he was romantically interested in her, but she did not reciprocate that interest. Former Seaman (SN) SB testified that the appellant had expressed a romantic interest in EN3 AC to him earlier that evening and confirmed that he was the messenger the appellant sent to ask EN3 AC to visit his table. However, SN SB testified that despite the conversation he facilitated between the two, he never observed them dancing or flirting together that evening—even though EN3 AC and the other women danced with other male Sailors. SN SB also made sexual comments about EN3 AC in the men's vehicle on the drive back to the base and recalled that the appellant was irritated, telling him to "calm down don't talk about my girl."[6]

Second, EN3 AC testified that after the two groups decided to leave HM1 AA and her in the SUV, the appellant told her he did not think it was safe. She told him she was fine in the parking lot as it was close to the ship's entry control point (ECP). After the groups departed for the ship, EN3 AC awoke minutes later to the appellant pulling on the SUV's door handle, and again convinced him she and HM1 AA were safe. However, despite twice telling the appellant she was fine and did not need his assistance, he again returned to the vehicle.

It was this second visit that culminated in the abusive sexual contact. EN3 AC testified when she awoke to find the appellant inside the vehicle, he:

> was in [a] crouching position headed towards the backseat. So the only thing I knew then was to just put my hands up for protection of whatever was going to happen and he came down on me, with his hands around my neck, and he stuck his tongue in my mouth. He was squeezing my cheeks with his hands to force my mouth open, put his tongue in my mouth again. He went underneath my shirt and bra, and he put his mouth around my breast. *And the whole time I'm fighting him off*

---

[6] Record at 258.

> *telling him no, stop, this isn't good, this is not good, like no, I don't want this. You know, this is not good.*[7]

Third, EN3 AC testified that in her struggle to escape the appellant's assault, she was "nudging HM1 [AA] the whole time like elbowing her, pinching her."[8] HM1 AA testified about finding "some nail marks on my left thigh"[9] that corroborated EN3 AC's contention that she pinched HM1 AA with her nails in the futile attempt to rouse HM1 AA during the incident.[10] Similarly, Quartermaster First Class (QM1) KG was the designated driver for the women's group that evening. Although she did not recall EN3 AC telling her about the incident that evening, she noted that she was personally tired by the evening's events, the attempts to rouse HM1 AA, and the late hour. There is some minor discrepancy as to when exactly EN3 AC told QM1 KG about the incident, but the conversation occurred within two days of the assault. QM1 KG clearly remembers EN3 AC was "emotional, sad, kind of distraught"—so much so that QM1 KG reported the incident to her chain of command.[11]

Next, the appellant contends that EN3 AC's testimony is not credible because she: (1) made multiple inconsistent statements, (2) was directly contradicted by multiple government witnesses, (3) had a motive to fabricate, and (4) has a character for untruthfulness. We disagree.

Although EN3 AC testified that there was tension between her and the appellant after she rebuffed his advances at the strip club and he attempted to enter her vehicle on the drive home, these events were not corroborated by any other witness. Likewise, she said she told QM1 KG about the assault that night in berthing, but QM1 KG testified to recalling that discussion having occurred a day or two later. As in any trial, there were some discrepancies between the witnesses and in EN3 AC's testimony, but here these differences were on issues of minor importance to the overall case.[12]

---

[7] *Id.* at 312 (emphasis added).

[8] *Id.*

[9] *Id.* at 378.

[10] *Id.* at 378-79. Prosecution Exhibit (PE) 4 at 1-2.

[11] Record at 274.

[12] The military judge instructed the members, "Bear in mind you may properly believe one witness and disbelieve several other witnesses whose testimony is in conflict with the one. The final determination as to the weight or significance of the evidence and the credibility of the witnesses in this case rests solely upon you, the members of the court." *Id.* at 453.

The alleged motive to fabricate a sexual assault allegation—to obtain an expedited transfer back to Norfolk—was easily rebutted. While it was true the ship was soon executing a homeport change from Norfolk to Mayport and EN3 AC had a good childcare situation for her son in Norfolk with her mother, there is little evidence that the shift to Florida was a significant concern for her. The request for transfer back to a Norfolk-based command, occurred only after the appellant, and later his friend, confronted EN3 AC on the messdecks about the allegations. EN3 AC waited three weeks after the report—and after the confrontations—before requesting a transfer. According to EN3 AC, she had arranged childcare for her son in Florida and signed a lease. The expedited transfer cost her "[her] welcome package and [her] $200.00 security deposit."[13]

Similarly, evidence of EN3 AC's character for untruthfulness, provided by a former roommate, was not particularly compelling given the fact that the two had experienced a falling out over an unpaid bill. Additionally, all of the appellant's contentions on appeal regarding EN3 AC's credibility were raised by the defense at trial through skillful cross-examination and in the defense's own case in chief.

However, the most compelling evidence was likely the appellant's own interrogation. The appellant did not testify at trial, but the video of his entire NCIS interrogation, lasting over five hours, was played for the members. During the vast majority of the interrogation, he denied any physical contact with either HM1 AA or EN3 AC. However, when finally confronted about possible DNA evidence linking him to the allegations involving EN3 AC, he suddenly admitted to some touching of EN3 AC, including "probably licking her breast."[14] But he argued it was consensual.

The appellant's substantial change in demeanor after being confronted with potential DNA evidence is also significant in our assessment of his credibility. For the vast majority of the interrogation he appeared at ease and almost relaxed, but he became agitated and dramatically increased his rate of speech when discussing the possibility of his DNA inside the cup of EN3 AC's bra. His admission, along with demeanor change, was even noted by the agents who warned him that the video could be evidence at trial. Finally, near the end of the interrogation, the appellant mentioned for the first time that one of his friends also confronted EN3 AC on the ship about the allegations and recorded the conversation without EN3 AC's knowledge.

A reasonable factfinder could have found sexual contact and bodily harm, for purposes of the abusive sexual contact convictions, from the appellant

---

[13] *Id.* at 354.

[14] PE 2; *See also*, PE 3 at 4.

conceding the sexual contact, the DNA evidence establishing the sexual contact, EN3 AC's testimony about rebuffing his repeated advances, and the other witnesses' testimony corroborating portions of EN3 AC's testimony. Beyond legal sufficiency, the appellant's confrontations with EN3 AC that evening, her specificity regarding the allegations, and the relative weakness of her motive to fabricate demonstrate the strength of the government's case. Likewise, the appellant's initial denials of contact, stark reversal in demeanor, and peculiar discussion about the sexual contact when confronted with possible DNA evidence during his interrogation demonstrate consciousness of guilt. Weighing all the evidence, and making allowances for not having observed the witnesses, we also are convinced beyond a reasonable doubt that the abusive sexual contact convictions are factually sufficient.

**B. Sentence appropriateness**

We review sentence appropriateness *de novo. United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006). Under Article 66(c), UCMJ, a military appellate court "may affirm only such findings of guilty and the sentence or such part or amount of the sentence, as it finds correct in law and fact and determines, on the basis of the entire record, should be approved." "Sentence appropriateness involves the judicial function of assuring that justice is done and that the accused gets the punishment he deserves." *United States v. Healy*, 26 M.J. 394, 395 (C.M.A. 1988). This requires "'individualized consideration' of the particular accused 'on the basis of the nature and seriousness of the offense and the character of the offender.'" *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982) (quoting *United States v. Mamaluy*, 27 C.M.R. 176, 180-81 (C.M.A. 1959)). "While [a Court of Criminal Appeals] clearly has the authority to disapprove part or all of the sentence and findings," we may not engage in acts of clemency. *United States v. Nerad*, 69 M.J. 138, 145 (C.A.A.F. 2010).

Here the guilty findings were merged for sentencing, making the maximum punishment seven years' confinement, total forfeitures, a fine, reduction to paygrade E-1, and a dishonorable discharge. Trial counsel argued for one year of confinement, reduction to E-1, and a dishonorable discharge; defense counsel argued for three months' confinement and reduction to E-3. The appellant contends his sentence, specifically his dishonorable discharge, is "inappropriately severe due to his seven years of service, including two deployments, and the circumstances surrounding the offense[s]."[15]

---

[15] Appellant's Brief at 22.

The appellant pursued a shipmate junior to him after she had repeatedly rebuffed his advances. He sexually assaulted her by entering the SUV where she was asleep, after having been rejected and told to go away. All of this occurred on base and just outside the ship's ECP, where EN3 AC should have had peace of mind that she would be safe. EN3 AC testified to the lasting harm caused by the appellant's actions, stating she felt "betrayed and . . . setback in my career" and "now, I'm just kind of like standoffish more and hard to communicate with people and even . . . been called weird."[16] She also noted substantial sleep difficulties that negatively impacted her work performance and how difficult it was to discuss the incident with family members.

RULE FOR COURTS-MARTIAL 1003(b)(8)(B), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.), provides that a dishonorable discharge "should be reserved for those who should be separated under conditions of dishonor[.]" After review of the entire record, we find that the sentence is appropriate for this offender and his offense. *United States v. Baier*, 60 M.J. 382, 384-85 (C.A.A.F. 2005); *Healy*, 26 M.J. at 395-96; *Snelling*, 14 M.J. at 268.

Considering the nature and seriousness of the appellant's misconduct and the distrust it engendered in his victim, and having weighed the appellant's otherwise honorable service and the evidence submitted in extenuation and mitigation, we conclude that the approved sentence is appropriate under the circumstances. Granting sentence relief at this point would be to engage in clemency—a function reserved for the CA—and we decline to do so. *Healy*, 26 M.J. at 395–96.

### III. CONCLUSION

The findings and the sentence are affirmed.

Senior Judge MARKS and Judge JONES concur.

For the Court



R.H. TROIDL
Clerk of Court

---

[16] Record at 511-12.