# UNITED STATES NAVY–MARINE CORPS
# COURT OF CRIMINAL APPEALS

————————————

### No. 201700058

————————————

## UNITED STATES OF AMERICA
Appellee

v.

## GREGORY J. HOGAN
Lieutenant Junior Grade (O-2), U.S. Navy
Appellant

————————————

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Captain Robert J. Crow, JAGC, USN.
Convening Authority: Commander, Navy Region Southeast, Naval
Air Station, Jacksonville, FL.
Staff Judge Advocate's Recommendation: Commander George W.
Lucier, JAGC, USN.
For Appellant: Philip D. Cave, Esq.; Lieutenant Commander
William L. Geraty, JAGC, USN.
For Appellee: Captain Sean M. Monks, USMC; Lieutenant Megan
Marinos, JAGC, USN.

————————————

Decided 25 January 2018

————————————

Before MARKS, JONES, and WOODARD, *Appellate Military Judges*

————————————

**This opinion does not serve as binding precedent but may be cited as
persuasive authority under NMCCA Rule of Practice and Procedure
18.2.**

————————————

JONES, Judge:

A military judge sitting as a general court-martial convicted the
appellant, contrary to his pleas, of making a false official statement and
sexual assault, in violation of Articles 107 and 120, Uniform Code of Military
Justice (UCMJ), 10 U.S.C. §§ 907 and 920 (2012). The military judge

sentenced the appellant to four years' confinement and a dismissal. The convening authority (CA) approved the adjudged sentence and, except for the dismissal, ordered it executed.

The appellant asserts that the evidence is factually insufficient to prove the sexual assault. We disagree and, finding no error materially prejudicial to the substantial rights of the appellant, affirm the findings and sentence. Arts. 59(a) and 66(c), UCMJ.

## I. BACKGROUND

In early 2015, EM was romantically interested in Lieutenant (Junior Grade) FD (FD), and they had been dating for some weeks. FD was the appellant's friend and they served together in the same squadron. On 21 February 2015, EM, FD, and the appellant joined one of EM's friends, SS, to have drinks at a bar in Oklahoma City. EM drove her car to SS's house and parked it, and then SS drove the two of them in her car to the bar. Around 0130, after drinking at various bars for a few hours, the four agreed to meet at the appellant's apartment to continue hanging out. SS, EM, and the appellant drove to the appellant's apartment in SS's car. FD—who lived across the street from the appellant—said he would join them at the appellant's apartment after a short while. But FD never showed up that night, even after EM texted and phoned him several times. The group was joined, however, by one of EM's friends, AN.

EM had consumed approximately four drinks at the bars that night, and when she arrived at the appellant's apartment she made herself a cocktail. EM claims that she has no memory of any of the events that occurred after she drank that cocktail. A few hours later, around 0300-0400, she became very tired, or drunk, or both. SS, with the appellant's permission, put EM—fully clothed—in the appellant's bed. SS did this assuming FD was still coming by to meet EM and take her back to his place and because the appellant "said that he was going to be sleeping on the couch."[1]

SS and AN went home, leaving EM alone in the apartment with the appellant. The next thing EM remembers is waking up in the morning in an unfamiliar room, with her head spinning. She was lying on her side, and the appellant's penis was penetrating her vagina from behind. As soon as she realized she was not in FD's apartment and the person penetrating her was not FD, she screamed, hit the appellant, and jumped off the bed. She immediately found her underwear and jeans and put them on. She also began texting FD about what just happened.

---

[1] Record at 167.

EM testified that the appellant laughed at her reaction. She continued to call and text FD, trying to persuade him to take her to her car at SS's house, which was 10-15 miles away. After FD declined to help EM, she accepted a ride from the appellant. But instead of driving her to her car, the appellant drove EM to a hotel breakfast bar—where she refused to eat—and then back to his apartment. On the way back to the apartment, the appellant suggested going back and lying down together to rest. Once they arrived at the appellant's apartment complex, EM ran away from him and hid in an outdoor stairwell. EM again texted FD and begged for a ride to her car. Finally, FD acquiesced. In FD's car, EM was upset, quiet, and tearful. She told FD she felt violated by the appellant.

As soon as EM arrived home, she collapsed on the floor in front of her mother. Eventually she told her mother how she had awakened to the appellant penetrating her. EM's mother took her to a hospital where EM was interviewed by law enforcement personnel and participated in a sexual assault exam. EM then gave a statement to the Naval Criminal Investigative Service (NCIS), detailing what occurred. Later, NCIS interrogated the appellant, who repeatedly claimed he had not had any sexual contact whatsoever with EM.

## II. DISCUSSION

The appellant asserts the sexual assault conviction is factually insufficient.[2] The test for factual sufficiency is whether "after weighing all the evidence in the record of trial and recognizing that we did not see or hear the witnesses as did the trial court, this court is convinced of the appellant's guilt beyond a reasonable doubt." *United States v. Rankin*, 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006) (citing *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987) and Art. 66(c), UCMJ), *aff'd on other grounds*, 64 M.J. 348 (C.A.A.F. 2007). In conducting this unique appellate function, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as

---

[2] We note that the appellant does not challenge the legal sufficiency of the sexual assault conviction evidence upon which the military judge returned a finding of guilty for the sexual assault. However, we are mindful that Article 66(c), UCMJ requires us "to conduct a *de novo* review of [both the] legal and factual sufficiency of the case." *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990). "The test for legal sufficiency of the evidence is whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Humphreys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (citation and internal quotation marks omitted). We find the evidence legally sufficient.

to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

The appellant was convicted of sexual assault under Article 120(b)(2), UCMJ. To sustain a conviction under this statute, we must find the prosecution proved beyond a reasonable doubt that: (1) the appellant committed a sexual act upon EM by causing penetration of her vulva by his penis; and (2) the appellant did so when he knew or reasonably should have known that EM was incapable of consenting because she was asleep. Art. 120(b)(2), UCMJ.[3]

The government presented compelling evidence that the appellant wanted to have sex with EM, in spite of EM's strong feelings for FD and her complete lack of romantic interest in the appellant. Text messages between the appellant and FD from the day before revealed the appellant had looked up photos of EM on social media and was very interested in having sex with her. He repeatedly implored FD to let him have sex with her, even though the appellant had only met EM a few days before. He texted FD "[y]ou have to tell her to hook up with me."[4] But EM was not at all interested in the appellant. In fact, she was "creeped . . . out" by him and "didn't like how crass and derogatory he was about women."[5]

At his apartment that night, the appellant made repeated romantic overtures towards EM, but there is no evidence that EM ever reciprocated any of his advances. Rather, the evidence shows she rebuffed him at every turn. EM did not have any memory of these events, but, while at the apartment, SS witnessed the appellant trying to dance with EM and attempting to kiss her. SS testified that EM never returned any of his advances and, in fact, tried repeatedly to get away from him. SS confronted the appellant and told him what he was doing to EM was not right. In fact, SS was so disturbed by the appellant's behavior that she "got on the phone" with FD and told him the appellant was being "very touchy feely" with EM and acting inappropriately.[6] FD responded that he would be over later, after the bars closed.

SS also shed light on EM's level of intoxication that night and how heavy a sleeper she is after drinking. SS testified that she has seen EM get drunk

---

[3] *See also* Military Judges' Benchbook, Department of the Army Pamphlet 27-9 at 3-45-14 (10 Sep 2014); Art. 120(g)(8)(B), UCMJ.

[4] Prosecution Exhibit (PE) 10 at 4.

[5] Record at 120.

[6] *Id.* at 166.

before, and that night EM was a 7 or 8 on a scale of 1-10, with 1 being sober and 10 being extremely intoxicated. SS related that EM was somewhat coherent because she could still stand up and move around, but she eventually became more drunk and tired to the point SS had to put her to bed.[7] EM testified that she is a very heavy sleeper and that people even joke about how hard it is to wake her. SS confirmed that "[w]henever [EM] is drunk, it's very hard to wake her up. It's extremely hard."[8] SS added, "[t]here's been a couple of times where it's been really hard to wake her up, that I've had to slap her in the face."[9] This testimony helps explain how EM could have slept through the removal of her pants and underwear.

The government presented other evidence that corroborated EM's account of what occurred. When NCIS seized FD's phone, they found text messages between FD and the appellant, as well as FD and EM, that all supported EM's narrative. The records included a text from EM to FD, immediately after the incident, in which she described waking up to the appellant's penis inside of her and that she felt violated. The phone records confirmed that EM phoned and texted FD dozens of times that morning, attempting to persuade him to drive her to her car and help her get away from the appellant. The text messages between FD and the appellant further verified that the appellant had sex with EM—in spite of the appellant's claim to the contrary.

The appellant's principal arguments on appeal echo the same contradictory positions the military judge rejected at trial. He asserts that a sexual act never occurred; but if it did occur it was consensual and EM falsely accused him to save her relationship with FD.

We are convinced the appellant committed a sexual act on EM. The military judge twice found—in his special findings of fact—that EM's testimony was "very credible:"[10]

> [EM] was very clear and very credible that she awoke in the morning on 22 February 2015 in the [appellant's] bed while being penetrated by the [appellant]. Her friend, [SS], had put [EM] to bed fully dressed. When [EM] awoke she was lying on her side and her jeans and underwear were off. The [appellant] was behind her "already participating" with his penis inside her vagina. She was positive it was the [appellant] and identified him as the person who sexually penetrated her while

---

[7] At the time, EM was 5 foot, 3 inches tall and weighed 100 pounds. *Id.* at 74.

[8] *Id.* at 168.

[9] *Id.* at 169.

[10] Appellate Exhibit XI at 2, 3.

she was sleeping. She never provided him consent to engage in sexual intercourse.[11]

It is true that the sexual assault exam did not reveal the appellant's DNA on EM's body or conclusively prove a sexual act had occurred. However, these findings are not dispositive on the issue of whether the appellant penetrated EM. They are matters to be considered, along with all other evidence in the case. Although there was no objective physical evidence of penetration such as tears or foreign substances discovered during the exam, the nurse examiner did note tenderness and pain in EM's vaginal area. More importantly, the appellant admitted in text messages to FD—immediately after the incident—that he had sex with EM. FD asked the appellant, "Haha but she f****d you?!?" and the appellant answered, "Yes. . . . She claims to say she thought I was you."[12] His disclosure to FD is made more credible by his previously expressed desires to have sex with EM. And it contradicts his denial of sexual contact with EM to NCIS.

The government also proved beyond a reasonable doubt that EM was asleep. There was no evidence that EM awoke from the alcohol-fueled slumber in which SS left her and engaged in consensual intercourse with the appellant. Even assuming arguendo that the appellant was ignorant of the fact or mistaken as to whether or not EM was asleep at the time he penetrated her vulva with his penis, we are convinced beyond a reasonable doubt, after applying the standard of what an ordinary, prudent, sober adult would believe under the circumstances, that the appellant's ignorance or mistake was unreasonable.

We do not believe EM consented to sex with the appellant and then fabricated the allegation to save her relationship with FD. Admittedly, EM was very concerned with her relationship with FD. She hoped their relationship would ripen into something more serious because they had seen each other "non-stop" since they had met some weeks earlier, and FD "had taken the initiative to take [her] mother out to dinner."[13] She appears to have been much more smitten with him than he was with her, and she was unaware of the crass text messages between FD and the appellant prior to that night, wherein the two discussed their prurient interest in her. Regardless, we reject the appellant's contention that EM was a willing participant in the sexual encounter but then afterwards suffered "buyer's remorse" because of her romantic interest in FD. There is overwhelming

---

[11] *Id.* at 3.

[12] PE 10 at 5.

[13] Record at 98.

evidence of the appellant's strong desire to have sex with EM, while there is not a shred of evidence EM shared his desire. Even in her state of drunkenness that night, EM refused all of the appellant's romantic advances. It strains credulity to believe that the next morning EM awoke from a drunken slumber and suddenly decided to have sex with the appellant.

The strongest evidence supporting the proposition that EM fabricated the allegation to preserve her relationship with FD are the repeated statements she made right after the incident that she felt what happened was her fault and that she had cheated on FD. EM initially believed she was not sexually assaulted because she had been asleep when the appellant inserted his penis in her vagina. She told her mother how she had awakened to the appellant's penis inside of her. When her mother told her she had been raped, EM responded, "No, I was asleep, that's not--[rape]."[14] EM's misunderstanding of what constitutes sexual assault has no bearing on the appellant's criminal liability. We also reject the appellant's contention that EM contrived the sexual assault allegation because her mother labeled the appellant's conduct a crime.

We recognize that we did not see or hear EM testify. But after carefully reading the record we find—as the military judge did—that EM's testimony is credible and compelling. We are convinced beyond a reasonable doubt that the appellant committed a sexual act upon EM while she was sleeping and without her consent. We find the evidence both legally and factually sufficient.

### III. CONCLUSION

The findings and the sentence as approved by the CA are affirmed.

Senior Judge MARKS and Judge WOODARD concur.

For the Court



R.H. TROIDL
Clerk of Court

---

[14] *Id.* at 103.