# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

———————————

**No. 201600134**

———————————

**UNITED STATES OF AMERICA**
Appellee

v.

**SHANON L. BEST**
Master Chief Hospital Corpsman (E-9), U.S. Navy
Appellant

———————————

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Captain Robert J. Crow, JAGC, USN.
Convening Authority: Commander, Navy Region Southeast,
Jacksonville, FL
Staff Judge Advocate's Recommendation: Commander Nell O. Evans,
JAGC, USN.
For Appellant: James S. Trieschmann, Jr., Esq.; Lieutenant
Jacqueline M. Leonard, JAGC, USN.
For Appellee: Major Kelli A. O'Neil, USMC; Major Cory A. Carver,
USMC.

———————————

Decided 25 May 2017

———————————

Before CAMPBELL, FULTON, and HUTCHISON, *Appellate Military Judges*

———————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

———————————

HUTCHISON, Judge:

A panel of officer members sitting as a general court-martial convicted the appellant, contrary to his pleas, of two specifications of rape and one specification of obstructing justice in violation of Articles 120 and 134,

Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920 (2000) and 10 U.S.C. § 934 (2012), respectively. The convening authority (CA) approved the adjudged sentence of 30 years' confinement and a dishonorable discharge.

The appellant asserts three assignments of error (AOEs)[1]: (1) the rape specifications are barred by the statute of limitations because the Supreme Court has held that the death penalty for rape is unconstitutional; (2) the military judge abused his discretion by permitting a government expert witness to testify about a 13-year-old step-daughter's capacity to consent to sexual intercourse with her stepfather[2]; and (3) the evidence is legally and factually insufficient to support Specification 2 of Charge I. Having carefully considered the record of trial and the parties' submissions, we conclude the findings and sentence are correct in law and fact, and find no error materially prejudicial to the appellant's substantial rights. Arts. 59(a) and 66(c), UCMJ.

## I. BACKGROUND

The appellant was convicted of two specifications of raping his stepdaughter, LN, over the course of several years, beginning when she was a child. Specification 1 alleges rape on divers occasions between 5 December 1999 and 4 December 2003, while Specification 2 alleges rape on divers occasions between 5 December 2003 and 30 September 2007. The sworn charges were received by the officer exercising summary court-martial jurisdiction on 3 April 2015.

LN was born in December 1987 and was five years old when the appellant married her mother, MB. For the first several years of the marriage, LN lived with her biological father and had only sporadic interaction with the

---

[1] We have renumbered the AOEs.

[2] The appellant further alleges that the military judge committed instructional error by issuing contradicting instructions:

> IMMEDIATELY AFTER THE MILITARY JUDGE RULED THAT THE GOVERNMENT EXPERT COULD NOT TESTIFY TO THE ULTIMATE ISSUE OF CONSENT, THE MILITARY JUDGE ABUSED HIS DISCRETION BY ALLOWING THE EXPERT WITNESS TO TESTIFY THAT A 13-YEAR-OLD STEP-DAUGHTER COULD NEVER HAVE THE CAPACITY TO CONSENT TO SEXUAL INTERCOURSE WITH HER 33-YEAR-OLD STEPFATHER. THE MILITARY JUDGE ALSO COMMITTED INSTRUCTIONAL ERROR BY ISSUING CONTRADICTING INSTRUCTIONS "THAT NOT ALL CHILDREN INVARIABLY ACCEDE TO PARENTAL WILL" AND THAT THE MEMBERS SHOULD RELY ON EXPERT TESTIMONY TO DETERMINE CONSENT.

Appellant's Brief of 17 Oct 2016 at 1.

appellant. However, she lived with her mother and the appellant as a teenager.

During March 2001, the appellant, MB, LN, and the three children the appellant and MB had together all travelled to Texas, because the appellant's grandfather was ill. LN testified that the appellant entered the room in which she was sleeping and asked her if "he could be somebody that [she] could practice sexual things with, that way when [she] do[es] come into contact with boys [she] would know what [she] was doing[.]"[3] Although LN told him "no" because she "couldn't do that to [her] mom," the appellant persisted, and "the next thing [LN] remember[s] [the appellant] was on top of [her]" and "had sex with [her]."[4]

Sexual encounters between the appellant and LN continued over the next several years at the appellant's various duty stations. LN described how the appellant would approach her for sex whenever the two were alone together. Although LN testified that she definitely did not want the appellant to have sex with her, "at the time, [she] fe[lt] like that's all [she] knew" and that sex with her stepfather "was just so normal for [her]."[5] At times she told the appellant they should stop having sex. In response, the appellant would isolate and ignore her and she would not be included in family outings. LN also testified that the appellant told her never to tell anyone about their sexual encounters, that he would kill himself if anyone ever found out, and that "one day [she would] look back and hate [him] and realize what [he had] done."[6]

The appellant was the sole provider and disciplinarian for the family and was very strict with LN, affording her very little privacy. He read her diaries, and she was not permitted to have a boyfriend or to talk with boys on the phone. LN described being constantly grounded for months at a time over very minor issues. The appellant also punished her by removing her bedroom door. LN testified that the appellant got angry whenever she got in trouble and that she was afraid of him. She felt like she had to have sex with him if he wanted to, because it was "what made him happy . . . .[she] felt like if [she] didn't do that it would cause trouble and it would ruin everything."[7]

MB testified that she first found out about the appellant having sex with LN in 2007, after she discovered LN with a male friend in her bedroom. The

---

[3] Record at 215.

[4] *Id.*

[5] *Id.* at 226.

[6] *Id.* at 224.

[7] *Id.* at 235.

appellant was out of town, and when he returned a few days later, MB informed him that LN had a boy with her in her bedroom. MB testified that the appellant reacted by "freaking out and throwing up, panicking."[8] At that point, MB was already suspicious that something was going on between the appellant and LN, and she told the appellant to "[j]ust tell [her]."[9] The appellant admitted to MB that he had been having sex with LN since she was "like 12, 13," but downplayed his role, telling MB that LN "was evil, that she was bad, that they were gonna go off and be together, and they were gonna leave [MB] and the kids to go be together."[10] After the appellant's disclosure to MB, the appellant and MB sent LN to live with her biological father in Texas.

LN admitted during cross-examination that, while she lived in Texas, she sent the appellant e-mails telling him she wanted him to "dream about"[11] her and stating, "[w]e can finally be together, because I don't want anyone else. I never have."[12] LN also disclosed that the appellant never physically forced her to have sex with him and never threatened her with physical violence or punishment. LN further conceded that she, at times, approached the appellant for sex, that she wrote him love letters, and that she told the appellant that she loved him. After joining the Navy in 2008, and while at bootcamp, LN sent the appellant letters, referring to him as "baby" or "Shanon."[13] The appellant attended LN's bootcamp graduation, and the two engaged in sexual intercourse in a hotel room that night.

In a controlled call conducted during the subsequent Naval Criminal Investigative Service investigation, LN confronted the appellant about being "only 12 years old and more vulnerable than ever and [him being] a 31 year old man," when their sexual relationship began and the "the guilt [he] put on [her] when [she] would approach [him] asking for all this to stop."[14] She told the appellant that he "created a wall between [her] and the whole family for [his] own benefit;" that he "broke [her] down to nothing, making her believe [she] wasn't good enough for anything;" and that the appellant "took more

---

[8] *Id.* at 282.

[9] *Id.*

[10] *Id.* at 282-83.

[11] *Id.* at 264-65.

[12] *Id.* at 263-64.

[13] *Id.* at 246.

[14] Prosecution Exhibit 3 at 3-4.

and more control over [her]."[15] In response, the appellant admitted that HN LN was "100 percent right with everything" she said.[16]

At trial, a forensic psychiatrist, Dr. H, testified as an expert witness regarding the importance of the parent-child relationship, especially as the brain develops in adolescence. He explained that the relationship is "critical because the parent provides the framework" or the "lens in which . . . the child sees the world."[17] Dr. H explained that a parent is "tremendously influential in helping the child realize what is appropriate, what is not appropriate, what is normal, what is not normal[.]"[18] When asked by the trial counsel what happens if the trust between a parent and a child becomes distorted, Dr. H testified:

> [A]ny number of things can happen, but . . . what I see clinically when the primary relationship is distorted or pathological or deviant is that the child makes bad decisions. They have a distorted sense of what is right and wrong. They have a distorted sense of what they should do or what they shouldn't do. They have a distorted sense of whether and when it is not appropriate to act on impulses.[19]

Dr. H then gave a lengthy explanation on "grooming," describing such behavior as the deliberate and thoughtful set of behaviors designed to "leverage and exploit the vulnerable nature of the victim and to perpetuate the deviant feelings of the predator."[20] Dr. H explained that the goal of grooming was psychological, vice physical, coercion and referred to such conduct as manipulation. Finally, after listening to her testimony, Dr. H noted that LN "spoke of control, isolation[,] and secrecy," all of which are "central components of grooming" and indicative of a coercive environment.[21]

---

[15] *Id.*

[16] *Id.* at 5.

[17] Record at 307.

[18] *Id.*

[19] *Id.*

[20] *Id.* at 308.

[21] *Id.* at 329.

## II. DISCUSSION

### A. Statute of limitations

During these offenses, Article 43(a), UCMJ,[22] provided that "[a] person charged with . . . any offense punishable by death, may be tried and punished at any time without limitation." Otherwise, Article 43(b)(1), UCMJ, then as now, imposes a five-year statute of limitations, preventing trial by court-martial for an offense committed "more than five years before the receipt of sworn charges and specifications by an officer exercising summary court-martial jurisdiction over the command." The statutory maximum punishment for rape at the time of the charged offenses was "death or such other punishment as a court-martial may direct." Article 120(e)(1), UCMJ.[23] The appellant contends, however, that the death penalty for rape under Article 120, UCMJ, is unconstitutional given the Supreme Court's holdings in *Kennedy v. Louisiana*, 554 U.S. 407 (2008) (concluding the Eighth Amendment barred imposition of the death penalty for rape of a child) and *Coker v. Georgia*, 433 U.S. 584 (1977) (holding a sentence of death was grossly disproportionate and excessive punishment for the crime of rape). Consequently, the appellant argues, Charge I is subject to the five-year statute of limitations in Article 43(b)(1), UCMJ. We disagree.

The Court of Appeals for the Armed Forces (CAAF) conclusively ruled that "rape is an offense punishable by death for purposes of exempting it from the 5-year statute of limitations of Article 43(b)(1)," UCMJ. *Willenbring v. Neurauter*, 48 M.J. 152, 180 (C.A.A.F. 1998) (internal quotation marks omitted). In *Willenbring*, the appellant sought an extraordinary writ, contending that, given the Supreme Court's holding in *Coker*, death was not a possible punishment for the three specifications of rape with which he was charged. Since his offenses were alleged to have occurred approximately nine years before the charges were received by the officer exercising summary court-martial jurisdiction, Willenbring argued the charges were barred by the five-year statute of limitations imposed by Article 43(b)(1), UCMJ. The CAAF found that "the question of whether the death penalty may be imposed, given the facts and circumstances of any particular case, does not control the statute of limitations issue." *Id.* at 178.

---

[22] 10 U.S.C. § 843(a) (1986). The 2006 amendment adding "rape" to the enumerate offenses having no statute of limitations under Article 43(a) and extending the statute of limitations for child abuse offenses to "the life of the child or within five years after the date on which the offense was committed, whichever provides a longer period," applied only to offenses committed on or after 1 October 2007—the first day after the appellant's charged period. 109 P.L 163 Sec. 553(a)-(b).

[23] 10 U.S.C. § 920(e)(1) (2000).

Consistent with *Willenbring*, our sister court vacated a military judge's order dismissing two specifications of rape, following a government interlocutory appeal pursuant to Article 62(b), UCMJ. *United States v. Toussant*, No. 20080962, 2008 CCA LEXIS 564 (A. Ct. Crim. App. 30 Dec 2008) (mem. op.). Like the appellant here, Toussant argued that the Supreme Court's holding in *Kennedy* barred his prosecution for rape since the crimes occurred more than five years ago. The Army Court of Criminal Appeals disagreed, reasoning that the Supreme Court clarified that its decision in *Kennedy* was limited to the civilian context,[24] and that *Willenbring* "made clear" that Article 43(b)(1)'s five-year statute of limitations did not apply to the crimes of rape and rape of a child. *Id.* at *10.

We see no reason to deviate from the CAAF's clear pronouncement of the law in *Willenbring*, nor from the Army court's application of that law—to facts strikingly similar to those presented here—in *Toussant*. Consequently, we conclude that Specifications 1 and 2 under Charge I are not barred by the statute of limitations.

## B. Expert witness testimony

The appellant next contends that the military judge erred "when he allowed the government's expert to testify that a thirteen-year-old does not have the capacity to consent to sexual intercourse."[25]

"[E]rror may not be predicated upon the admission of testimony unless there is a timely objection on the record." *United States v. Robbins*, 52 M.J. 455, 457 (C.A.A.F. 2000) (citation omitted). However, "[a]s an exception, [we] may take notice of plain error even though not brought to the attention of the military judge if the appellant demonstrates that there was an error, that the error was plain ('clear' or 'obvious'), and that the error materially prejudiced the substantial rights of the appellant." *Id.* (citing *United States v. Powell*, 49 M.J. 460, 463-65 (C.A.A.F. 1998)); Art. 59(a), UCMJ; and MILITARY RULE OF EVIDENCE (MIL. R. EVID.) 103(d), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.)).

---

[24] *Toussant*, 2008 CCA LEXIS 564, at *9 (quoting *Kennedy v. Louisiana*, 554 U.S. 945, 947-48 (2008) (denying petition for rehearing, and explaining that the Court "need not decide whether certain considerations might justify differences in the application of the Cruel and Unusual Punishments Clause to military cases (a matter not presented . . . for [the Court's] consideration) and, that whether or not "the Manual for Courts-Martial retains the death penalty for rape of a child or an adult when committed by a member of the military does not draw into question [the Court's] conclusions that there is a consensus against the death penalty for the crime in the civilian context[.]").

[25] Appellant's Brief at 9.

On the other hand, where a proper objection is raised at trial, we review a military judge's rulings on the admissibility of evidence for an abuse of discretion. *United States v. Griffin,* 50 M.J. 278, 284 (C.A.A.F. 1999). Therefore, we must first determine whether the defense objected to this evidence at trial, in order to determine the proper standard by which we evaluate this alleged error.

Following a cross-examination in which Dr. H conceded that 13-year-old teenagers make "bad" or "inappropriate" decisions, that they can "flirt with an older adult," and that they "can have sexual contact with an adult,"[26] the government counsel began redirect with the following question:

> Dr. H[], you just testified after the defense question that teenagers may make bad decisions. In your opinion can a 13 year old girl make a consensual decision to have sex with a 31 year old stepfather?[27]

The civilian defense counsel objected. The military judge sustained the objection and instructed the members to disregard the question. The trial counsel then continued:

> Q. Based on your knowledge and expertise, Dr. H[], is a 13 year old able to appreciate and weigh the ramifications of sexual activity accurately?
>
> A. I'm of the opinion, to a reasonable degree of medical and psychiatric certainty, no, unequivocally no and that's why they have parents, because they don't have that *capacity* and their parents are there to help them make better decisions.[28]

The civilian defense counsel did not object to this specific question and answer. The appellant now contends that following the trial defense counsel's prior objection, "the government continued to elicit improper testimony" from Dr. H and "the [m]ilitary [j]udge failed to perform his role to prevent it."[29] We disagree and find the civilian defense counsel's failure to object forfeited the issue. Therefore, we review admission of this testimony for plain error and find none.

As a threshold matter, we disagree with the appellant's underlying premise that Dr. H testified that a 13-year old girl was *incapable of consenting* to sex with her stepfather. Indeed, after trial defense counsel's

[26] Record at 321-22.

[27] *Id.* at 323.

[28] *Id.* at 327 (emphasis added).

[29] Appellant's Brief at 10.

objection, the military judge prevented Dr. H from answering that specific question—whether or not a 13-year-old could "make a consensual decision to have sex" with a stepfather.[30] Instead, Dr. H testified regarding whether a 13-year-old had the *capacity* to "appreciate and weigh the ramifications of sexual activity accurately[.]"[31] The appellant points to no law—and we have found none—that supports the contention that being "unable to appreciate and weigh the ramifications of sexual activity accurately" is the same thing as being incapable of consenting. Consequently, absent objection from defense counsel, there was no "clear" or "obvious" error in admitting the testimony. *Powell,* 49 M.J. at 463-65.

We also find no merit in the appellant's argument that Dr. H's testimony—which "characterize[d] a 33 year old stepfather having sex with his 13 year old stepdaughter" as "deviant" and "pathological"—lacked a proper foundation.[32]

The "military judge has broad discretion as the gatekeeper to determine whether . . . an adequate foundation" has been established. *United States v. Green,* 55 M.J. 76, 80 (C.A.A.F. 2001) (citations and internal quotation marks omitted). "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." MIL. R. EVID. 703, SUPPLEMENT TO MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.). Put simply, an expert's opinion can be formed from "personal knowledge, assumed facts, documents supplied by other experts, or even listening to the testimony at trial." *United States v. Houser,* 36 M.J. 392, 399 (C.M.A. 1993).

In *United States v. Raya,* the CAAF held that the military judge did not abuse his discretion by admitting testimony of a social worker who testified that a rape victim suffered from post-traumatic stress disorder, despite never having interviewed or treated the victim. 45 M.J. 251, 253 (C.A.A.F. 1996). The fact that the social worker formed her opinion from listening to the trial testimony, reading the reports of others, and "assuming facts as alleged by the victim were true," went to the weight of the evidence and not its admissibility. *Id.* The same is true here. The trial counsel laid a proper foundation for Dr. H's testimony by establishing (1) Dr. H had assessed and treated victims and perpetrators involved in step-parent/stepchild relationships and, (2) Dr. H had reviewed the relevant facts in the case and observed LN's testimony.

---

[30] Record at 323.

[31] *Id.* at 327.

[32] *Id.* at 315. During an effective cross-examination of Dr. H, the civilian defense counsel made clear to the members that the terms "deviant" and "pathological" were medical terms and carried no legal effect. *Id.* at 320-21.

Moreover, unlike the social worker in *Raya*, Dr. H did not testify about a specific condition or make a medical diagnosis concerning LN; rather he testified about the psychological conditions that are associated with victims of childhood sexual assault. "In cases involving allegations of sexual abuse of a child, a qualified expert may inform the fact finder of characteristics commonly found in sexually abused children and describe the characteristics exhibited by the alleged victim." *United States v. Rodriguez-Lopez*, No. 33548, 2001 CCA LEXIS 223, at *33, unpublished op., (A.F. Ct. Crim. App. 26 Jul 2001) (citing *United States v. Birdsall*, 47 M.J. 404, 409 (C.A.A.F. 1998)) (additional citations omitted), *aff'd*, 58 M.J. 19 (C.A.A.F. 2002). Therefore, given the military judge's broad discretion as gatekeeper, we find no error in the admission of Dr. H's testimony.

Finally, the appellant avers that the military judge erred "[b]y referencing Dr. H[]'s testimony on consent in his instructions," thereby injecting "inadmissible evidence into the definition of 'consent,'" and "instructing the members that they could use Dr. H[]'s opinion to determine the element of consent."[33]

"Whether a panel was properly instructed is a question of law reviewed *de novo*." *United States v. McClour*, 76 M.J. 23, 25 (C.A.A.F. 2017) (citations and internal quotation marks omitted). Where there is no objection to an instruction at trial, this court reviews for plain error. *United States v. Tunstall*, 72 M.J. 191, 193 (C.A.A.F. 2013). Having found that the military judge did not err in admitting Dr. H's testimony, we reject the appellant's assertion that "inadmissible evidence" was injected into the definition of consent.[34] Regardless, the members were properly instructed on the elements of rape, the standard of proof, and the government's requirement to prove beyond a reasonable doubt that the sexual intercourse was achieved by force and without consent. "Absent evidence to the contrary, [we] may presume that members follow a military judge's instructions." *United States v. Taylor*, 53 M.J. 195, 198 (C.A.A.F. 2000) (citing *United States v. Loving*, 41 M.J. 213, 235 (C.A.A.F. 1994)) (additional citation omitted). The military judge also instructed the members on constructive force, explaining:

> In deciding whether the victim did not resist or ceased resistance because of constructive force in the form of parental duress or compulsion, you must consider all of the facts and circumstances including, but not limited to, the age of the child when the alleged abuse started, the child's ability to fully comprehend the nature of the acts involved, the child's

---

[33] Appellant's Brief at 12-13.

[34] *Id.*

knowledge of the accused's parental power, any implicit or explicit threats of punishment or physical harm if the child does not obey . . . the parent's commands, the accused harming himself, the family being ruined and the child's dependency upon the parents. If [LN] did not resist or ceased resistance due to compulsion or duress of parental command, constructive force has been established and the act of sexual intercourse was done by force and without consent.[35]

The military judge further instructed, "In deciding whether [LN] had at the time of the sexual intercourse the requisite knowledge and mental development, capacity and ability to consent, you should consider *all of the evidence in the case*, including, but not limited to, her age, education and the testimony of Dr. H[]."[36] Finally, specifically with regards to Dr. H's expert testimony, the military judge instructed the members "you are not required to accept the testimony of an expert witness or give it more weight than the testimony of an ordinary witness."[37]

Taken as a whole, we conclude that the military judge's reference to Dr. H's testimony, along with all the other evidence in the case, was not clearly or obviously erroneous and was, in any event, properly bounded by the military judge's admonition that members were free to disregard the testimony or give it no more weight than that of any other witness. Therefore, we find no plain error in the military judge's instructions.[38]

## C. Legal and factual sufficiency

In his final assignment of error, the appellant contends that the evidence is legally and factually insufficient to support a conviction for Specification 2 under Charge I, because throughout the charged period, LN was not a "child of tender years" and the "government's theory of the case . . . was rape by constructive force, that LN did not consent because of her young age, and that Appellant had power over her as a parent."[39]

---

[35] Record at 411-12.

[36] *Id.* at 413 (emphasis added).

[37] *Id.* at 421.

[38] Although we find no error in either the military judge's admission of Dr. H's testimony or the military judge's instructions, we conclude that even if the military judge erred, there was no material prejudice to a substantial right of the appellant. Art. 59(a), UCMJ. *See United States v. Berry*, 61 M.J. 91, 98 (C.A.A.F. 2005) (evaluating the strength of the government case, the strength of the defense case, and the materiality and quality of the evidence in question, in determining whether any error substantially influenced the members' decision).

[39] Appellant's Brief at 22.

We review questions of legal and factual sufficiency *de novo.* Art. 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, any reasonable fact-finder could have found all the essential elements beyond a reasonable doubt." *United States v. Day*, 66 M.J. 172, 173-74 (C.A.A.F. 2008) (citing *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987)). In applying this test, "we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

The test for factual sufficiency is whether "after weighing all the evidence in the record of trial and recognizing that we did not see or hear the witnesses as did the trial court, this court is convinced of the appellant's guilt beyond a reasonable doubt." *United States v. Rankin*, 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006) (citing *Turner*, 25 M.J. at 325 and Art. 66(c), UCMJ), *aff'd on other grounds*, 64 M.J. 348 (C.A.A.F. 2007). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

The appellant argues that, in addition to LN being 16 to 19 years old during the period charged in Specification 2, she "never said 'no,' resisted, or attempted to flee her situation with the [a]ppellant."[40] Rather, she sent him love letters and emails and wanted him to divorce her mother so she could marry him. Indeed, while LN testified she felt controlled, manipulated, and brainwashed, she also testified the appellant never forced her or threatened her with violence or punishment to affect that control over her.

The appellant relies on *United States v. Rhea*, 33 M.J. 413 (C.M.A. 1991), where the Court of Military Appeals (CMA) set aside Rhea's convictions for raping and committing indecent acts with his stepdaughter by using "constructive force" when she was between the ages of 16 and 19. The appellant's reliance on *Rhea* is misplaced. The CMA remanded the case so that "the court below [could] undertake a further review of the sufficiency of the evidence and the instructions" with a "focus on whether the subtle and psychological effects of Rhea's relationship to [his stepdaughter]—to the extent that relationship still existed—were *still* sufficient to constitute constructive force" in light of his stepdaughter's age. *Id.* at 425 (emphasis in original) (internal quotation marks omitted). On remand, the Air Force Court

---

[40] *Id.* at 23.

of Military Review concluded that "parental duress did still provide the coerciveness that constitutes 'constructive force' even when [the victim] was 20 years old" and that Rhea's stepdaughter "did not willingly consent to . . . sexual intercourse[.]" *United States v. Rhea*, No. 27563, 1992 CMR LEXIS 470, at *11 (A. F. C. M. R. 11 May 1992).

In *United States v. Young*, 50 M.J. 717 (A. Ct. Crim. App. 1999), the Army court affirmed Staff Sergeant Young's conviction for raping his stepdaughter when she was between the ages of 16 and 20, holding that the government's theory that the victim was "groomed" and "conditioned" to comply with Young's demands from an early age was fully supported by the evidence, including the testimony of two child sexual abuse expert witnesses. *Id.* at 726.

We reject—as did the Army court in *Young*—any suggestion that parental compulsion evaporates as a matter of law when a child reaches 16. Certainly, no case law supports such a rule. Therefore, in order for the appellant to prevail, we must find that the evidence produced at trial was legally insufficient to establish constructive force, *i.e.*, parental compulsion.

As in *Rhea* and *Young*, sexual activity between the appellant and LN began well before LN turned 16. LN testified that the appellant first raped her when she was 13. In addition, LN had little privacy; the appellant read her diaries and, as a punishment for minor transgressions, removed the door from her bedroom. Even after LN graduated from high school, the appellant did not let her date. LN further testified that she got to the point where sex with the appellant felt "normal" to her, and she wanted to keep him happy.[41] Like the victims in *Rhea* and *Young,* LN viewed the appellant as the authority figure and main provider for the family and continued to live in his house during much of the charged period.

Finally, testimony from Dr. H expounded on the concept of parental compulsion. He testified that grooming a child to have sex involves behaviors like isolation and taking advantage of the inherent authority a parent has over a child; it was possible for a child to be coerced through that psychological manipulation to give in to an authority figure's wishes. Importantly, Dr. H also testified that he heard testimony in this case indicating LN was in a coercive environment when she lived with the appellant.

After carefully reviewing the record of trial and considering all of the evidence in a light most favorable to the prosecution, we are convinced that a rational factfinder could have found the appellant's sexual intercourse with

---

[41] Record at 226.

LN was by force and without her consent, despite the fact that she was older than 16, given the government's theory of constructive force through parental compulsion. Furthermore, weighing all the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced beyond a reasonable doubt of the appellant's guilt.[42]

### III. CONCLUSION

The findings and sentence, as approved by the CA, are affirmed. The supplemental promulgating order will reflect that the specification under Charge II was withdrawn and dismissed prior to the entry of pleas. *United States v. Crumpley*, 49 M.J. 538, 539 (N-M. Ct. Crim. App. 1998).

Senior Judge CAMPBELL and Judge FULTON concur.

For the Court

R.H. TROIDL
Clerk of Court



---

[42] Although we find Specification 2 both factually and legally sufficient, we note that the military judge merged both Charge I specifications for sentencing purposes. *Id.* at 606. Consequently, even were we to set aside Specification 2 and reassess the sentence in accordance with *United States v. Winckelmann*, 73 M.J. 11 (C.A.A.F. 2013), we would still affirm the sentence as approved by the CA.