# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

————————————————

**No. 201600238**

————————————————

## UNITED STATES OF AMERICA
Appellee

v.

## ABEL A. MONTESDEOCA
Senior Chief Culinary Specialist (E-8), U.S. Navy
Appellant

————————————————

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Captain Charles N. Purnell, JAGC, USN.
Convening Authority: Commander, Navy Region Mid-Atlantic,
Norfolk, VA.
Staff Judge Advocate's Recommendation: Commander Andrew R.
House, JAGC, USN.
For Appellant: Greg D. McCormack, Esq.; Lieutenant Douglas R.
Ottenwess, JAGC, USN.
For Appellee: Major Kelli A. O'Neil, USMC; Lieutenant Commander
Jeremy R. Brooks, JAGC, USN.

————————————————

Decided 28 September 2017

————————————————

Before HUTCHISON, FULTON, and SAYEGH, *Appellate Military Judges*

————————————————

**This opinion does not serve as binding precedent, but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

————————————————

HUTCHISON, Senior Judge:

Contrary to his pleas, a general court-martial, consisting of members with enlisted representation, convicted the appellant of one specification each of sexual assault and abusive sexual contact in violation of Article 120, Uniform

Code of Military Justice (UCMJ), 10 U.S.C. § 920 (2012).[1] The military judge conditionally dismissed, prior to sentencing, the abusive sexual contact specification as an unreasonable multiplication of charges, and the members sentenced the appellant to six months' confinement, reduction to pay grade E-6, and a dishonorable discharge. The convening authority (CA) approved the sentence as adjudged.

In two assignments of error, the appellant alleges that his convictions for sexual assault and abusive sexual contact are factually insufficient.[2] Having carefully considered the record of trial and the parties' submissions, we conclude the findings and sentence are correct in law and fact and find no error materially prejudicial to the appellant's substantial rights. Arts. 59(a) and 66(c), UCMJ.

## I. BACKGROUND

The appellant first met BR when they were both assigned to USS DWIGHT D. EISENHOWER (CVN 69). From June to September 2012, the appellant was BR's leading chief petty officer and supervised her as she worked in the ship's wardroom, cleaning and serving food during EISENHOWER's deployment. The appellant and BR did not interact outside work, and BR testified that she did not like the appellant as her supervisor, explaining that he was "a little nitpicky" and that whatever she did "wasn't good enough."[3] As a result, BR developed "an attitude with him."[4]

After the appellant detached from EISENHOWER, he moved in with Logistics Specialist Second Class (LS2) TM, who was a friend of BR's. BR would see the appellant when she went to visit her friend but testified that there was little interaction with the appellant during these visits: "I would see him when he walked in the door and it would be like a 'Hey,' and I'd just kind of give him a dirty look like oh, it's that guy from deployment."[5] To prevent tensions from escalating between her roommate and her friend, LS2 TM encouraged BR to talk to the appellant and work through their issues. As

---

[1] The members acquitted the appellant of one specification of rape, in violation of Article 120, UCMJ.

[2] In his second assignment of error (AOE), the appellant argues that should we set aside his conviction for sexual assault, we should then also set aside, on factual sufficiency grounds, his conviction for abusive sexual contact—which was conditionally dismissed by the military judge. Our conclusion that the appellant's conviction for sexual assault was factually sufficient renders the second AOE moot.

[3] Record at 638.

[4] *Id.*

[5] *Id.* at 639.

a result, on 12 November 2014, the appellant and BR began chatting online via Facebook. The conversations were initially work-related but eventually resulted in the appellant asking BR to go to dinner with him. Although BR testified she had no romantic interest in the appellant, she decided to go to dinner with him anyway to make her boyfriend jealous. The next day, the appellant and BR went to dinner where they talked about "[LS2 TM], our kids, work stuff, deployment" but nothing "romantic."[6] Afterwards, the appellant drove BR home and "[e]verything was pretty casual."[7] Before exiting the appellant's car, BR gave the appellant a hug, but when he tried to kiss her, she said "no," because she had "no interest in kissing him whatsoever[.]"[8] She then opened the car door and went inside her apartment.

The following day, the appellant and BR exchanged several text messages in which the appellant asked BR to spend the day with him, to send him a picture, and to "get a place by the beach this weekend."[9] Although BR rebuffed most of the appellant's advances, she agreed again to go to dinner with him. Prior to going out with the appellant a second time, BR texted her friend, LS2 JF, about the reservations she was having. She explained to LS2 JF that, "I don't want him to think that because he paid for [two] meals that means I have to put out. . . [b]ecause Lord knows I really don't want to[.]"[10] LS2 JF assured her that was not "what it mean[s]," and that she should take the free food.[11] However, LS2 JF agreed that if BR sensed the appellant "was crazy" she could text him the code word "hair brush" and he'd be on "standby" to respond.[12]

After the appellant and BR finished dinner, the appellant once again drove BR to her apartment. BR testified that the appellant was interested in seeing her dog, so she invited him inside. Once inside the apartment, however, she texted LS2 JF the code word "hair brush."[13] She explained during her testimony that she did this because she was annoyed with the appellant's company and "figured if somebody else showed up, he would leave. I wanted to make sure he actually left."[14] When LS2 JF arrived, BR

---

[6] *Id.* at 647.

[7] *Id.* at 650.

[8] *Id.* at 650-51.

[9] Prosecution Exhibit (PE) 2 at 10.

[10] PE 10 at 3.

[11] *Id.*

[12] *Id.* at 1.

[13] *Id.* at 4.

[14] Record at 666.

went outside to talk to him and asked LS2 JF to come inside and ask the appellant to leave. However, LS2 JF was not comfortable doing that and encouraged BR to simply come with him or to tell the appellant that she had to leave. But BR did not want to leave her dog, so she decided to stay, hoping the appellant would leave soon.

BR testified that throughout the appellant's time in her apartment, he was sitting on the couch and watching TV, while she was "pacing back and forth, texting friends, not really paying him any attention, hoping that he'll get the hint."[15] At one point, BR sat on the couch to take off her boots and to put on flip-flops so that she could take her dog out for a walk.[16] As she sat down, the appellant leaned over, tried to put his arm around her, and attempted to kiss her. BR stood up and went to the door, and saw that the chain clasp and deadbolt on her door had been locked. She testified that as she stood at the door unlocking the deadbolt, the appellant grabbed her by the waist and arm and kissed her. She responded by telling him, "No, I don't want to kiss you, I don't want to do this."[17] She further testified that the appellant was being rough and trying to convince her that "it was going to be ok[.]"[18] BR pushed him away and ran towards her bedroom. She explained that she was going to grab a lamp to hit him with, but tripped and fell on her way to the bedroom. The appellant then approached her, backed her into her bedroom wall, picked her up by her arms and shoulders, and tried to kiss her again. BR continued to tell the appellant "no" but he "kept saying it was going to be okay and just let it happen[.]"[19]

Despite her attempts at fighting back and pushing the appellant off of her, he was able to remove BR's jeans and underwear and position her on her back on her bed. BR explained that the appellant then placed his forearm across her chest to hold her down, while he used his other hand to remove his pants. She described what happened next:

> I could feel him moving. He was trying to put himself inside me, and I didn't want it to happen, and I was like throwing my hips up and everything trying to block it.[20]

---

[15] *Id.* at 669.

[16] BR explained that her boots get stuck in the mud and she wanted to change shoes before going outside. *See id.* at 670.

[17] Record at 672.

[18] *Id.* at 673.

[19] *Id.* at 677.

[20] *Id.* at 681.

BR then testified that the appellant put his penis inside her vagina and it felt like she "was ripped open" and "[a]ll [she] could think about was the pain."[21] BR was finally able to push the appellant off of her using her legs and knees, roll over, grab her cell phone, and run into the bathroom. Once in the bathroom, BR began calling and texting friends. She texted LS2 JF, "he raped me . . . you sai[d] he wouldn't."[22]  However, LS2 JF had gone to sleep and did not answer the texts. BR eventually reached Logistics Specialist Third Class (LS3) AM, a friend who lived in the same apartment complex, and told her that she "needed her to come over."[23]

When LS3 AM arrived, BR left the bathroom, hurriedly put on her pants and went to the door to let LS3 AM inside. LS3 AM explained what she saw when she entered:

> I knocked on the door and she let me in really quickly. And she just had this look on her face like—and I was like, 'What's wrong?' and I went in the apartment. And I was like 'You okay?' and I seen the Chief, or whatever, in the bedroom. . . . I was like, 'Why is he here?' [A]nd she was like—we went outside and she told me that he wouldn't leave. And she was like breaking—she was saying like fragments of stuff, and I could tell by her face she was really upset, but she wouldn't say what happened.[24]

LS3 AM further testified that BR told her the she felt "nasty and dirty" and was scared because she did not know how to get the appellant to leave her apartment. LS3 AM and BR eventually convinced the appellant to leave after telling him that BR had agreed to watch LS3 AM's son that night. LS3 AM stayed with BR until the appellant drove away. BR asked LS3 AM to take her to the hospital, but LS3 AM said she couldn't because she had to take her baby back home.

The next morning, LS2 JF accompanied BR to the hospital, where BR made a report of sexual assault, and was examined by a sexual assault nurse examiner (SANE). The examiner noted injuries consistent with "penetrative trauma," but the SANE could not determine whether that trauma was caused by a "consensual or non-consensual act[.]"[25]

---

[21] *Id.*

[22] PE 11 at 1; Record at 699.

[23] Record at 700.

[24] *Id.* at 894.

[25] *Id.* at 558.

## II. DISCUSSION

We review questions of factual sufficiency *de novo*. Art. 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for factual sufficiency is whether "after weighing all the evidence in the record of trial and recognizing that we did not see or hear the witnesses as did the trial court, this court is convinced of the appellant's guilt beyond a reasonable doubt." *United States v. Rankin*, 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006) (citing *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987) and Art. 66(c), UCMJ), *aff'd on other grounds*, 64 M.J. 348 (C.A.A.F. 2007). While the evidentiary standard *beyond a reasonable doubt* is a significant burden, it does not mean "that the evidence must be free from conflict." *Id.* (citation omitted).

In conducting our unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399. We "judge the credibility of witnesses, and determine controverted questions of fact," and substitute our judgment for that of the fact finder. Art 66(c), UCMJ; *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990).

The appellant alleges that the testimony of BR is not credible, and as a result, the "foundation upon which the conviction is based falls apart[.]"[26] In support of his argument, the appellant resurrects the same arguments made at trial—BR admitted to using the appellant to make her boyfriend jealous, and there were several factual contradictions.

First, the SANE noted in her report that BR reported that the appellant sucked on her nipple and the SANE identified corresponding bruising around the areola. However, during trial, BR testified that her shirt and bra remained on throughout her encounter with the appellant and any bruising on her nipple was caused by her boyfriend during a consensual sexual encounter a few days before the assault. Likewise, the SANE report indicates that BR reported both anal and vaginal digital penetration, yet during her testimony BR denied that either occurred. On redirect examination, BR testified that she did not remember telling the SANE that the appellant sucked her nipples or that he digitally penetrated her.

Next, there were also minor inconsistencies between BR's testimony at an Article 39(a), UCMJ, pretrial hearing and her testimony at trial regarding her first date with the appellant, and whether they hugged or the appellant

---

[26] Appellant's Brief of 19 Dec 2016 at 5.

touched her before she got out of his car. The appellant also points out that BR testified that she was offended by the appellant's conduct, but nonetheless resumed texting with him early the next morning and then agreed to go on another date with him the following night.

There were other factual discrepancies that arose through the testimony: LS3 AM testified BR was wearing boots when she answered the door, but BR did not mention putting on her boots when she testified that she grabbed a pair of pants and ran to the door to let LS3 AM in; BR told LS3 AM that she was on a blind date with the appellant—as opposed to a second date with an individual she had known for some time; the SANE report indicated that BR stated the appellant "went crazy" after entering her apartment; BR told the SANE she hit and scratched the appellant, and yet LS3 AM observed no injuries on the appellant and testified that the appellant's shirt was neither torn nor disheveled.

These minor inconsistencies highlighted by the appellant do not fundamentally undermine BR's credibility as it relates to the elements of the offenses. "As in any trial, there were some discrepancies . . . but here these differences were on issues of minor importance to the overall case." *United States v. Bracewell*, No. 201600060, 2017 CCA LEXIS 325, at *10, unpublished op. (N-M. Ct. Crim. App. 11 May 2017). BR was remarkably steadfast during both direct and cross-examination regarding her lack of interest in any physical contact with the appellant. Significantly, her testimony regarding the sexual assault was corroborated by her conduct immediately following the assault—she made phone calls and sent text messages to LS2 JF and LS3 AM, including a text message to LS2 JF stating, "he raped me."[27] Moreover, LS3 AM's testimony regarding BR being "really upset" when she arrived at BR's apartment,[28] and BR's report of sexual assault the following morning at the hospital add further weight to BR's credibility. In short, any inconsistencies regarding ancillary matters were not so fatal as to cast reasonable doubt on BR's testimony that a sexual assault occurred.

After weighing all the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced beyond a reasonable doubt of the appellant's guilt.

---

[27] PE 11 at 1; Record at 699.

[28] Record at 894.

### III. CONCLUSION

The findings and sentence, as approved by the CA, are affirmed.

Judge FULTON and Judge SAYEGH concur.



For the Court

R.H. TROIDL
Clerk of Court